#25330, #25333-a-JKM

**2011 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MARK DAVIS and BONNIE DAVIS,
as individuals and as parents and natural
guardians of CHARLIE DAVIS, CARL DAVIS,
JOEY DAVIS, and SELENA DAVIS; KAY
EBEN, as an individual and as parent and
natural guardian of GRACE EBEN and
KENDRA EBEN; DAN GRANT and JANE
GRANT, as individuals and as parents and
natural guardians of DYLAN BAMBAS and
ALEXIS BAMBAS; DEBRA BUCHHOLZ and
CALVIN BUCHHOLZ, as individuals and as
parents and natural guardians of HANNAH
BUCHHOLZ and JARED BUCHHOLZ;
JULIA ORROCK, as an individual and as
parent and natural guardian of LUCIUS
ORROCK and DOMINIC ORROCK;
JULIE SCHENKEL, as an individual and
as parent and natural guardian of NATHAN
SCHENKEL and NOAH SCHENKEL;
ANITA BACH and TODD BACH, as
individuals and as parents and natural
guardians of TAYLOR BACH, TYRA BACH,
and SETH BACH; MIKE HINTZ and JULIE
HINTZ, as individuals and as parents and
natural guardians of KAITLIN HINTZ and
HANNAH HINTZ; BRAD NELSON and RITA
NELSON, as individuals and as parents and
natural guardians of CHANTEL NELSON
and SHAINA MARESH; SHANE McINTOSH
and TAMARA McINTOSH, as individuals and
as parents and natural guardians of LANDRY
McINTOSH and BENNETT McINTOSH;
JIM AKRE and KAY AKRE, as individuals
and as parents and natural guardians of
TAYLOR AKRE; DAWN BIALAS and KURT
BIALAS, as individuals and as parents and
natural guardians of MORGAN BIALAS,
CONNOR BIALAS, and KEELAN BIALAS;
and RON SCHOENFELDER and RENEA
SCHOENFELDER, as individuals and as
parents and natural guardians of TAYLOR

SCHOENFELDER, SADIE SCHOENFELDER,
and MOLLY SCHOENFELDER                                    Plaintiffs and Appellants,

           v.

THE STATE OF SOUTH DAKOTA; SOUTH
DAKOTA DEPARTMENT OF EDUCATION;
SOUTH DAKOTA BOARD OF EDUCATION;
Honorable M. MICHAEL ROUNDS, in his official
capacity as the Governor of the State of South
Dakota; RICK MELMER, in his official capacity
as the Secretary of Education of the State of
South Dakota; VERNON L. LARSON, in his
official capacity as the Treasurer of the State
of South Dakota,                                         Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LORI S. WILBUR
Judge

* * * *

RONALD A. PARSONS JR.
SCOTT A. ABDALLAH
PAMELA R. BOLLWEG
SHANNON R. FALON of
Johnson, Heidepreim, & Abdallah LLP          Attorneys for plaintiffs
Sioux Falls, South Dakota                    and appellants.

MARTY J. JACKLEY
Attorney General

DIANE BEST
BOBBI J. RANK
Assistant Attorneys General                  Attorneys for defendants
Pierre, South Dakota                         and appellees.

* * * *

ARGUED JANUARY 11, 2011

OPINION FILED **08/31/11**

#25330, #25333

MEIERHENRY, Retired Justice

[¶1.]		When our state founders laid the cornerstone for our state capitol building in 1908, the distinguished leader and Dakota Territorial Superintendent of Public Instruction, Gen. W.H.H. Beadle, addressed the crowd.  He spoke of the importance of education to the future of the state:

> The advance of every free state depends upon the broad intelligence of its citizens.  Because we are a state, republican in form, education of all the people becomes the highest duty of the state.  Nothing can be so important except the struggle for the very existence of the republic.  The genius of the poorest must have equal chance with the opportunity of the rich.  The true state will not disregard the welfare of the humblest orphan.  Our resources of farm, orchard, and mine, our soils and our water supply, our rocks, our clays, must be scientifically studied and mastered; our livestock, our entire productive possibilities require a scientifically trained and educated people.  As our population doubles and crowds our area, this need increases.  This training should be masterly and broad and prepare as fully also for all civic and social duties.  Not for wage earning alone, nor for money making alone, must we educate.  All skill, all technical training, all science, all the industries, can not together, but unaided, save and develop all that human society and government have in charge for our permanent welfare.  Technology is required for the world's progress, but it is not all the story of man's advancement.

> * * *

> The mastery of history, government, literature, philosophy; the knowledge of all the world and its mutual and conflicting interests, of the origin and nature of human society and "the grand results of time" must be the possession of those who are to lead us in the profound questions bound up in the state and national and international interests.

> * * *

> The great, final, single, comprehensive aim of education and of the highest education is the equipment of men for moral leadership.  I believe that all this should be done inside the state, that all scholars, all teachers and all trained citizens

-1-

should be made by institutions within our own state. Within our borders, under our laws and institutions, under the discipline of our own conditions and inspired by our state pride, all this can best be done. All the elements of, and inspiration for it, should be thoroughly given in our common schools, from our libraries and at our firesides.[1]

General Beadle's convictions are embedded in the language of South Dakota's Constitution.

[¶2.]     Article VIII, Section 1 of the South Dakota Constitution emphasizes the importance of a "general and uniform system of public schools" and places the duty to establish the system on the State Legislature:

> The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a *general and uniform system* of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.

(Emphasis added.) The Legislature also has the duty to fund education. Article VIII, Section 15 of the South Dakota Constitution directs the Legislature to provide through general and local taxation as follows:

> The Legislature shall make such provision by general taxation and by authorizing the school corporations to levy such additional taxes as with the income from the permanent school fund shall secure a thorough and efficient system of common schools throughout the state.

[¶3.]     Whether the Legislature has met the constitutional requirements of adequately funding education is the central question in this action. The plaintiffs–a group of children who attend public schools in South Dakota school districts and

---

1.     Oscar William Coursey, *A Complete Biographical Sketch of General William Henry Harrison Beadle* 87-91 (1913).

their parents and natural guardians–claim that the present system of funding education is unconstitutional because it does not provide all children with an adequate and quality education. Specifically, the plaintiffs ask for a declaratory ruling that Article VIII, Sections 1 and 15 mean (1) "that the South Dakota Constitution entitles all children to a free, adequate and quality public education," and (2) that the present system of funding is unconstitutional because it does not provide all children with an adequate and quality education.

[¶4.] Clearly, the language of the South Dakota Constitution guarantees every child a free public education to provide them with "the advantages and opportunities of education." What this means and its relationship to funding, however, is a trickier question.[2] To answer that question, we look at the plain

---

2. Defendants are the State of South Dakota, the South Dakota Department of Education (SDDOE) (a subdivision of South Dakota state government), the South Dakota Board of Education, and three state officials in their official capacities: The Governor, M. Michael Rounds; the State Treasurer, Vernon L. Larson; and the South Dakota Secretary of Education, Dr. Rick Melmer. Either since the trial of this matter or the appeal to this Court, the state officials named as defendants have been replaced in office by election or, in Dr. Melmer's case, through resignation and a subsequent appointment. The proceedings are as follows:

In June 2006, the plaintiffs filed a complaint against the defendants in circuit court for the Sixth Judicial Circuit in Hughes County, South Dakota. The complaint asked the court to: a) declare that the public school finance system violates the education clauses of the state constitution; b) prohibit the defendants from "administering, enforcing, and/or funding" the public school finance system; c) maintain judicial oversight over the legislative and executive branches of state government to correct "constitutional inadequacies."

In March 2007, the defendants filed a motion to dismiss for lack of subject matter jurisdiction on the ground that the plaintiffs' claims were not justiciable. The plaintiffs filed a motion for partial summary judgment

(continued . . .)

meaning of the language and the intent of its drafters. *See Brendtro v. Nelson*, 2006 S.D. 71, ¶ 34, 720 N.W.2d 670, 681-82. The drafters used key words in defining the Legislature's duty. They required the Legislature to "establish and maintain a *general* and *uniform system* of public schools, . . . adopt all *suitable* means *to secure* to the people the *advantages and opportunities* of education," and provide funding to "*secure* a *thorough* and *efficient* system of common schools throughout the state." S.D. Const. art. VIII, §§ 1, 15 (emphasis added). The plain and ordinary meaning of these key words appears unchanged since 1889 when South Dakota's Constitution was ratified.[3] *General* means "[p]ertaining to, affecting, or applicable to, each and all of the members of a class, kind, or order"; *uniform* is "[h]aving always the same

---

( . . . continued)

asking the court to declare that education is a fundamental right under the South Dakota Constitution and that Article VIII of the South Dakota Constitution guarantees all South Dakota children a free, adequate and quality public education. The plaintiffs also asked the court to declare standards for an adequate and quality education under the South Dakota Constitution.

After a hearing, the trial court denied the defendants' motion to dismiss for lack of subject matter jurisdiction. The trial court did, however, dismiss the plaintiffs' claims for any remedy beyond declaratory relief under the Declaratory Judgments Act. *See* SDCL ch. 21-24. The court also denied the plaintiffs' motion for partial summary judgment but declared: "Article VIII of the South Dakota Constitution guarantees as a constitutional right that all South Dakota children are entitled to a free and adequate public education[.]"

The case was tried from September 2 through September 30, 2008. On June 10, 2009, the trial court entered findings of fact, conclusions of law and a judgment in favor of the defendants and against the plaintiffs on all claims. Plaintiffs appeal.

3.  *See, e.g.*, *Campbell Cnty. Sch. Dist. v. State* (*Campbell Cnty. I*), 907 P.2d 1238, 1258 (Wyo. 1995) (quoting *The Century Dictionary* (1889) in defining "uniform," "system," "thorough," and "efficient").

form, manner, or degree"; and *system* is "[a]n aggregation or assemblage of objects united by some form of regular interaction or interdependence." *Webster's New International Dictionary of the English Language* 1043, 2777, 2562 (2nd ed. 1937). *Suitable* means "suited to . . . one's needs, wishes, or condition, the proprieties, etc., appropriate; fitting," and *secure* is "to make secure or certain; to ensure." *Id.* at 2522, 2263. *Advantage* and *opportunity* are similarly defined as "[a]ny condition, circumstance, . . . or means, particularly favorable to success, or to any desired end," or "juncture of circumstances favorable to some end." *Id.* at 38, 1709. *Thorough* means "so complete as to leave nothing unaffected or wanting"; and *efficient* signifies "[c]apable, competent, [and] able." *Id.* at 2631, 819.

[¶5.]    Thus, the plain and ordinary meaning of the language of Article VIII, Section 1 requires the Legislature to establish a general system of free public schools, each of the same form, and to employ all appropriate and fitting means to ensure children in South Dakota are afforded the advantages and opportunities of education. Additionally, Article VIII, Section 15 directs the Legislature to provide a method of general and local taxation that, along with income from the permanent school fund, ensures the existence of a system of common schools throughout the state. The school system must be complete in all respects, as well as capable, competent, and able.

[¶6.]    We check this interpretation against the historical context and intent of the framers of the South Dakota Constitution. *See Campbell Cnty I.*, 907 P.2d at 1259. *See also Doe v. Nelson*, 2004 S.D. 62, ¶ 10, 680 N.W.2d 302, 306. The importance of education to those early leaders is unmistakable.

[¶7.] As early as 1861, the organizers of the Territory of Dakota set aside land for schools. Comm. on Territories, 49th Congr., 1st Sess., Rep. to Accompany Bill S. 967 at 18, 20 (1886). Section 14 of the Organic Act organizing the Territory directed that sections sixteen and thirty-six of each township should be reserved for schools. Organic Act of March 2, 1861, ch. 86, § 14, 12 Stat. 239, 243 (1863). Thus, "[z]eal for learning has characterized the South Dakotan from the earliest period." 1 Doane Robinson, *History of South Dakota* 470 (B.F. Bowen & Co. 1904). "From the earliest beginning of the Dakota Territory, the [citizens] have been vitally interested in educating their children."[4] As described by Pattinson F. McClure, Dakota Territorial Commissioner of Immigration: "No matter how recent the settlement, how ambitious the strife for worldly possessions, the church and school are there, the site and foundations for which occupy the first cares of every new community."[5] General Beadle reflected later in his life that: "[P]eople in territorial days . . . would have a school, if it met in a log or sod shanty or in a room in a private home, or in the first little church."[6]

---

4. C.A. Beaver, *Financial Support for Education in South Dakota from the Beginning of Territorial Days, in* 18 South Dakota Historical Collections, Studies in South Dakota Education 35 (R.W. Kraushaar ed., Smith & Co. 1936).

5. William Maxwell Blackburn, *Historical Sketch of North and South Dakota 1893, reprinted in* 1 South Dakota Historical Collections 78 (News Printing Co. 1902).

6. *Memoirs of General William Henry Harrison Beadle with Editorial Notes by Doane Robinson, reprinted in* 3 South Dakota Historical Collections 151 (1906).

[¶8.]      In his message to the First Territorial Legislature in 1862, newly

appointed Governor William Jayne gave voice to the settlers' zeal for education,

observing:

> There is no subject more vital to the prosperity and general
> welfare of the territory than the subject of education.  The
> virtue, intelligence, and public happiness of a people, and all
> that conduces to the advancement of the prosperity, wealth, and
> power of a country, is intimately associated with, and dependent
> upon, the development of the educational interest of the state.
> In communities where truth, virtue, intelligence and knowledge
> prevail, there crime is rare, and poverty almost unknown.  Every
> dollar of taxes levied for the support of schools lessens, by many
> dollars, the taxes which would be assessed for the support of
> prisons and poor houses.[7]

[¶9.]      The Territorial Legislature authorized General Beadle, who became

the Territorial Superintendent of Public Instruction in 1878, to visit the capitals of

five other states to study their laws and experiences in utilizing their public school

lands.[8]  Based on his observations, he was to draft constitutional provisions and

statutes to obtain the best returns from Dakota's school lands.[9]  General Beadle

visited the capitals of Iowa, Minnesota, Wisconsin, Illinois, Indiana and Michigan.[10]

He later issued a report recommending that:

> The great body of common schools of the state should be so
> organized as to work in harmony under one general plan, and

---

7.      Cleata B. Thorpe, *Education in South Dakota, Its First Hundred Years, 1861-1961* (1968), *reprinted in* 36 South Dakota Historical Collections 205, 213 (1972).

8.      Thorpe, *supra* note 7, at 232.  *See also* 1879 Dakota Laws ch. 14, § 4.

9.      *See* 1879 Dakota Laws ch. 14, § 4.

10.     Memoirs of General Beadle, *supra* note 6, at 178.

enable every person to prepare for admission from the lowest grade to the highest education the state can give by successive stages of study and qualification. The common schools can be supported by the grant of school lands if managed with wisdom and integrity[.][11]

[¶10.] General Beadle wanted to secure permanent funding for public education. He was afraid that territorial school lands (totaling in the millions of acres) would be sold to land speculators at low prices to meet the short term needs of public education.[12] General Beadle and other founders were determined to preserve the school lands until their value increased so that they could be sold for higher prices and provide maximum support for public education into the future.[13] General Beadle's plan was that all money from the sale of school lands (for not less than $10 per acre) would be safely invested in a school fund to permanently endow education.[14] Clearly, ardent support of public education motivated the founders of our state.

[¶11.] Public education and desire for permanent funding prominently took their place in the state's draft constitutions. The draft constitution, prepared at the constitutional convention in Sioux Falls in 1883, incorporated provisions that would

---

11.    W.H.H. Beadle, *Dakota Schools* (1882), *reprinted in* 3 South Dakota Historical Collections 247, 260 (1906).

12.    Everett W. Sterling, *The Bumpy Road to Statehood, in* Dakota Panorama 363, 364 (J. Leonard Jennewein & Jane Boorman eds., Brevet Press 3rd prtg. 1973).

13.    *Id.*

14.    *Id*. at 364-65.

later become Article VIII of the South Dakota Constitution.[15] Article VII, Section 1 of the draft constitution provided: "The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the Legislature to establish [a] general and uniform system of public schools."[16] Per General Beadle's plan, Article VII, Sections 2, 3, and 4 of the draft required creation of a permanent trust fund largely from the proceeds of the sale of school lands for the maintenance of public schools in the state.[17] Section 4 of the draft prohibited the sale of school lands for less than $10 per acre.[18] Section 5 of the draft provided: "The Legislature shall make such provision by taxation or otherwise, as, with the revenue from the permanent school fund, shall secure a thorough and efficient system of common schools throughout the State." 1 Dakota Constitutional Convention, *supra* note 15, at 30.

[¶12.] Although Congress refused to recognize the draft constitution of 1883, its education provisions survived largely intact through two later constitutional conventions in 1885 and 1889. *See id.* at 44 - 48.[19] Those provisions formed the

---

15. *See* Introductory, *in* 1 Dakota Constitutional Convention 5-7 (Doane Robinson ed., Huronite Prtg. Co. 1907).

16. *Id.* at 29.

17. *Id.* at 30.

18. *Id.*

19. *See also* George Harrison Durand, *Joseph Ward of Dakota* 169-70 (Pilgrim Press 1913); Herbert S. Schell, *History of South Dakota* 221-22 (S.D. State Hist. Soc. Press 4th ed., rev. 2004); 2 South Dakota Constitutional Convention 250-60 (Doane Robinson ed., Huronite Prtg. Co. 1907).

foundation for current Article VIII of the South Dakota Constitution, adopted by the voters in 1889–the same year South Dakota formally became a state.[20]

[¶13.]    The constitutional framers' zealous efforts to preserve school lands as a permanent school funding source demonstrate their strong commitment to education and its significance to the citizenry and the economic and institutional development of this state.  This historical context gives insight into the intent and meaning of the constitutional provisions.  The Wyoming Supreme Court, interpreting a similar constitutional provision, also found historical context instructive.  The court wrote:

> From this history, we can conclude the framers intended the education article as a mandate to the state legislature to provide an education system of a character which provides [state] students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually.

*Campbell Cnty. I*, 907 P.2d at 1259 (citing *Kukor v. Grover*, 436 N.W.2d 568, 589-90 (Wis. 1989)).  Other courts have interpreted educational mandates in their constitutions comparably.[21]  We believe the framers of South Dakota's constitutional provision intended a similar mandate to our State Legislature.

---

20.    *Schell, supra* note 19, at 222.

21.    *See Connecticut Coalition for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 253 (Conn. 2010) (interpreting the Connecticut Constitution to require an education "suitable to give [students] the opportunity to be responsible citizens" and "to progress to institutions of higher education, or to attain productive employment[.]"); *Skeen v. State*, 505 N.W.2d 299, 310 (Minn. 1993) (interpreting the Minnesota Constitution to require an education enabling students to "'discharge intelligently their duties as citizens'" and "'to prepare them for useful and happy occupations[.]'") (quoting *Bd. of Educ. of Sauk Centre v. Moore*, 17 Minn. 412, 416 (1871); *Pauley v. Kelly*, 255 S.E.2d 859,

(continued . . .)

[¶14.] We agree with the plaintiffs that the language of South Dakota's Constitution means that all children are entitled to a free, adequate, and quality public education. The constitutional language and intent of the framers guarantee *the children of South Dakota a constitutional right to an education that provides them with the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually.* The constitutional mandate does not contemplate a system that fails to educate all children or leaves pockets of inadequate conditions and achievement as a result of insufficient funding. As General Beadle so eloquently stated, "The genius of the poorest must have equal chance with the opportunity of the rich." Coursey*, supra* note 1, at 87. The question before us is whether the legislative scheme for funding education meets the constitutional requirements.

## BURDEN OF PROOF AND STANDARD OF REVIEW

[¶15.] For the plaintiffs to prevail, they must show that the public school funding system is unconstitutional because it fails to provide students with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. Our review is de novo. *See People in Interest of Z.B.,* 2008 S.D. 108,

---

( . . . continued)

877 (W. Va. 1979)); *Hoke Cnty. Bd. of Educ. v. State*, 599 S.E.2d 365, 380 (N.C. 2004) (interpreting the North Carolina Constitution as requiring preparation of students "'to participate and compete in the society in which they live and work[.]'") (quoting *Leandro v. State*, 488 S.E.2d 249, 254 (N.C. 1997)).

¶ 5, 757 N.W.2d 595, 598; *Green v. Siegel, Barnett & Schutz*, 1996 S.D. 146, ¶ 7, 557 N.W.2d 396, 398.

[¶16.]     We have consistently considered the constitutionality of legislative acts according to "well-known principles": "Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakably shown and there is no reasonable doubt that it violates fundamental constitutional principles." *South Dakota Ass'n of Tobacco & Candy Dist. v. State By & Through Dept. of Revenue*, 280 N.W.2d 662, 664-65 (S.D. 1979) (citations omitted).  The "presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption . . . ."  SDCL 19-11-1.  *See also Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 16, 784 N.W.2d 499, 506 (citing *Estate of Dimond*, 2008 S.D. 131, ¶ 9, 759 N.W.2d 534, 538).  A presumption is rebutted "[w]hen substantial, credible evidence has been introduced . . . ."  *Id.*  A presumption of constitutionality requires weighty evidence to overcome it.  *See Dimond,* 2008 S.D. 131, ¶ 9, 759 N.W.2d at 538.  Challengers also have the burden of persuading the court that "there is no reasonable doubt that it violates fundamental constitutional principles." *South Dakota Ass'n,* 280 N.W.2d at 664-65.[22]

---

22.     This does not mean that the plaintiffs have the burden of proving each fact beyond a reasonable doubt, as the State argues.  We find no merit in this argument because it confuses the distinction between burden of production and burden of persuasion.  We attempted to clarify the difference in *Gordon v. St. Mary's Healthcare Center*:

> For many years the term 'burden of proof' was ambiguous because the term was used to describe

(continued . . .)

[¶17.]     In the present case, the plaintiffs have the burden of persuading the Court beyond a reasonable doubt that the public school system fails to provide students with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually, and that this failure is related to an inadequate funding system.

## ANALYSIS

### *Current Funding Sources and Funding Formula*

[¶18.]     We begin with an overview of the state funding system.  The two main sources of revenue for the 161 public school districts are state aid and local property

--------

( . . . continued)

> two distinct concepts.  Burden of proof was frequently used to refer to what we now call the burden of persuasion-the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose.  But it was also used to refer to what we now call the burden of production-a party's obligation to come forward with evidence to support its claim.
>
> *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 272, 114 S. Ct. 2251, 2255, 129 L. Ed. 2d 221, 228 (1994).  "'It is generally said that the burden of production may pass from party to party as the case progresses while the burden of persuasion rests throughout on the party asserting the affirmative of an issue.'" *Hayes v. Luckey,* 33 F. Supp. 2d 987, 990 (N.D. Ala. 1997) (citation omitted).

2000 S.D. 130, ¶ 24, 617 N.W.2d 151, 157-58.

> If facts are in dispute, the trial court (as the fact-finder) resolves the differences and makes a finding as to those disputed facts based on the

(continued . . .)

taxes. *See* S.D. Const. art. VIII, § 15. The districts also depend on other revenue sources, such as borrowed funds through bond issues; funds from federal, state, or other political subdivisions; and funds received from fines and penalties. SDCL 13-16-1.[23]

[¶19.]    Prior to 1995, the Legislature funded school districts through an expenditure driven funding formula. The more a school district spent, the more state funding it received. The constitutionality of the formula was unsuccessfully challenged on equal protection grounds in state circuit court in 1994. *See Bezdichek v. State*, 1994 S.D.C.C. 34, Hughes County Civ. No. 91-209 (S.D. 6th Jud. Cir. 1994). The circuit court decision was not appealed. The South Dakota Legislature, however, revised the formula in the 1995 legislative session to take effect January 1, 1997. The revised formula funded districts based on an established per student allocation (PSA), a district's enrollment, and the amount of local property tax levied.

[¶20.]    The revised formula requires a multi-step calculation starting with the legislatively designated PSA. SDCL 13-13-10.1(4). The 1995 Legislature set the PSA at $3,350 beginning in fiscal year (FY) 1998 to be increased annually by the

---

( . . . continued)
    evidence produced. The trial court's findings are reviewed under a clearly erroneous standard. *State v. Dillon*, 2010 S.D. 72, ¶ 49, 788 N.W.2d 360, 373.

23.    School districts segregate their revenues into a number of separate fund accounts including the general fund, the capital outlay fund, the special education fund, and the pension fund. SDCL 13-16-2, 13-10-6. The general fund is used for all of the operational costs of a school district, excluding capital outlay and special education fund expenditures. SDCL 13-16-3. Thus, the general fund is the source from which almost all of the school district's funding requirements must be met. Local revenue generally accounts for approximately half the revenue in a school district's general fund. The remainder comes from state aid.

                                                              (continued . . .)

rate of inflation according to the Consumer Price Index (CPI) or by 3%, whichever was less. *See* 1995 S.D. Sess. Laws ch. 77, § 3. *See also* SDCL 13-13-10.1(3) - (4). Accordingly, the Legislature annually increased the PSA and, in some years, by more than the inflation rate. By the time of trial, the PSA was $4,642.

[¶21.]    Next, the formula establishes a school district's "local need." Local need is the product of the PSA multiplied by a school district's K-12 enrollment determined on a specified date in the fall. It may also include a "small school adjustment" if the enrollment is less than 600 students. SDCL 13-13-10.1(2A), (2C), (5). The small school adjustment increases the PSA by a fixed per pupil amount according to a statutory sliding scale maximizing at $847.54. SDCL 13-13-10.1(2C).[24]

[¶22.]    Finally, the formula determines a school district's "local effort," which is the total amount of local property tax levied. The local effort is then subtracted from the district's local need to arrive at the amount of state aid allocated to the district. SDCL 13-13-10.1(6), -73.

[¶23.]    In addition to revising the funding formula, the 1995 Legislature capped the local property tax levy. The levy caps effectively limit the amount a school district can raise locally. *See* 1995 S.D. Sess. Laws ch. 57, § 37; 1995 S.D. Sess. Laws ch. 77, § 6. The 1995 Legislature originally capped levies at the following amounts based upon three different classifications of local property:

_____

( . . . continued)

$16.75 per thousand dollars of taxable valuation for non-agricultural land; $6.25 per thousand dollars of taxable valuation for agricultural land; and $10 per thousand dollars of taxable valuation for owner-occupied single family dwellings. *Id*. After 1995, the Legislature steadily lowered these caps during every subsequent annual legislative session.[25] By the time of trial, the following caps were in effect for taxes payable in 2009: $8.78 per thousand dollars of taxable valuation for non-agricultural land; $2.61 per thousand dollars of taxable valuation for agricultural land; and $4.10 per thousand dollars of taxable valuation for owner-occupied single family dwellings. 2008 S.D. Sess. Laws ch. 48, § 1.

[¶24.]     The Legislature allows school districts to tax at less than the statutory maximum levies, but the state aid formula imputes the maximum to the local district in calculating its local effort. SDCL 10-12-42, 13-13-10.1(6). School districts may also "opt out" of the maximum levies and tax at higher rates. SDCL 10-12-43. If a school district opts out, the funds go into the school district's general fund in addition to the funds received under the state aid formula. *Id*.

[¶25.]     State funding based on the formula is the largest source of revenue for local districts. Local property taxes are usually the next major source of revenue.

---

( . . . continued)

24.     The small school adjustment replaced the former "small school factor" in 2007. The small school factor was similarly designed to provide additional assistance to smaller school districts.

25.     *See* 1996 S.D. Sess. Laws ch. 69, § 5; 1997 S.D. Sess. Laws ch. 53, § 1; 1998 S.D. Sess. Laws ch. 59, § 1; 1999 S.D. Sess. Laws ch. 49, § 1; 2000 S.D. Sess. Laws ch. 50, § 1; 2001 S.D. Sess. Laws ch. 51, § 1; 2002 S.D. Sess. Laws ch. 52, § 1; 2003 S.D. Sess. Laws ch. 52, § 1; 2004 S.D. Sess. Laws ch. 83, § 1; 2005 S.D. Sess. Laws ch. 60, § 1; 2006 S.D. Sess. Laws ch. 41, § 1; 2007 S.D. Sess. Laws ch. 48, § 1.

Other lesser sources of revenue include state educational trust funds, county fines, federal grants, school district gross receipts, and bank franchise taxes. *See* S.D. Const. art. VIII, § 3. School districts also receive other funds for education-related purposes such as capital outlay and pension funds collected through local revenue and special education funds from federal, state, and local sources. A district may also be eligible for a sparsity benefit based on enrollment, size, and distance criteria. *See* SDCL 13-13-78 to -79.[26]

***Alleged Funding System Flaws and Inadequacies***

[¶26.]      The plaintiffs identify problems with the school funding system that they claim make it structurally flawed and inadequate. They claim that the system is arbitrary and irrational because funding is not based on actual costs of providing students with a constitutionally adequate education and does not align funding with need.

---

26.      Periodically, the Legislature has appropriated per student funds outside of the state aid formula and funding for special programs such as consolidation incentives, heating assistance, career and technical education grants, and teacher compensation assistance. Further, the state has provided technological assistance to the school districts including: internet service and net management; provision of a student information management system (SIMS) accessible to parents online; and maintenance and support of the Dakota Digital video Network (DDN) used for distance learning. The state has also provided funding assistance for: GEAR UP programs to assist economically disadvantaged students; laptop computers and training for teachers and technology coordinators; formative assessment tools; regional agencies providing technical assistance to schools under the federal No Child Left Behind Act (NCLB); online testing for student diagnostic purposes; online curriculum assistance; online advanced placement courses and exam review; and online access to DakotaSTEP test results measuring proficiency for NCLB purposes.

[¶27.] Other jurisdictions have found school funding systems unconstitutional because funding was not based on actual costs. The Montana Supreme Court in *Columbia Falls Elementary School District No. 6 v. State*, held that, "[u]nless funding relates to needs such as academic standards, teacher pay, fixed costs, costs of special education, and performance standards, then the funding is not related to the cornerstones of a quality education." 109 P.3d 257, 262 (Mont. 2005). The Wyoming Supreme Court determined that Wyoming's school funding system was unconstitutional because the distribution formula was not based upon the actual costs of providing a basic education package to each student. *Campbell Cnty. I*, 907 P.2d at 1277.

[¶28.] Whether South Dakota's funding formula is based upon actual costs is unclear. The parties offered no evidence of actual costs. *Cf. Campbell Cnty. I*, 907 P.2d at 1251 (where the plaintiffs presented a cost study as evidence). Several witnesses, including two legislators, testified that the funding formula only provides a certain amount of funding to each school district, regardless of need. An SDDOE employee testified that she provided data to the 1995 Legislature when the formula was being developed. The data included general fund expenditures, the old funding formula "inclusions," and school enrollment. The witness further indicated the formula's original 1997 PSA derived from the costs and expenditures of all the school districts in the 1993-94 school year increased by 3.3% per year for inflation. We are unable to surmise from the evidence if the Legislature considered the actual cost of educating a student as part of the formula. Without evidence to the contrary, a court must presume the Legislature exercised its power to investigate

and determine such facts. *See State ex rel. Payne v. Reeves*, 44 S.D. 568, 595, 184 N.W. 993, 999-1000 (1921). *See also State ex rel. Kornmann v. Larson*, 81 S.D. 540, 551, 138 N.W.2d 1, 7 (1965); *Payne v. Jones*, 47 S.D. 488, 491, 199 N.W. 472, 473 (1924).

[¶29.]        Even if the Legislature used historical education costs instead of actual costs, the formula may still be valid. The Wyoming Supreme Court recognized that historical costs can be a starting point in *State v. Campbell County School District (Campbell Cnty. II)*, 19 P.3d 518 (Wyo. 2001). After determining that Wyoming's funding formula was unconstitutional in *Campbell County I*, the court directed the Wyoming Legislature to develop a school funding system based upon costs. 907 P.2d at 1279. The Wyoming Legislature retained a consulting firm for that purpose. *See Campbell Cnty. II*, 19 P.3d at 537. Rather than carrying out a study of actual costs, however, the consulting firm determined costs based upon statewide averages of past school district expenditures and "professional judgment." *Id*. The Wyoming Supreme Court held that, while this was not an ideal approach, the Wyoming Legislature had to "start somewhere" and use of past statewide average expenditures to estimate costs was appropriate. *Id*. at 538. The court went on to hold, however, that "regular and timely inflation adjustments" would be essential to funding the real costs of education. *Id*. at 549.[27]

---

27.    The Wyoming court also required a thorough review of all of the components of the funding system every five years to ensure funding accurately reflected actual costs school districts were paying because of market or economic conditions. *See Campbell Cnty. II*, 19 P.3d at 549.

[¶30.]        When the 1995 South Dakota Legislature developed the current

formula, it based the starting PSA for 1997 upon actual 1993-94 school district

expenditures plus a 3.3% inflation factor.  The Legislature then made provision in

the new formula for continuing annual inflationary adjustments to the PSA

according to the rate of inflation under the CPI or by 3%, whichever was less.  1995

S.D. Sess. Laws ch. 77, § 3.  *See also* SDCL 13-13-10.1(3)-(4).  The Legislature

annually appropriated the required inflationary adjustment to the PSA for each

year the formula was in place.  In some years, the Legislature appropriated a higher

rate of inflation than the formula required.  Based on the evidence at trial, it

appears that the school funding formula was originally designed in line with

historical cost data as regularly adjusted for inflation.

[¶31.]        The plaintiffs, however, find problems with the formula's inflation

provision.  They argue it is structurally defective because, in some years, annual

inflation may exceed the 3% cap in the formula.  *See* SDCL 13-13-10.1(3)-(4).  In

those years, education funding would fall behind actual costs.  This argument has

merit; however, the plaintiffs have not shown that this has occurred.  At the time of

trial, the Legislature had increased the PSA by *more* than the formula's required

inflation rate in four of the years preceding trial.

[¶32.]        The plaintiffs also criticize the formula's reliance on the CPI as a

measure of inflation.  They assert that the CPI does not capture inflationary

increases related to salaries and benefits which typically constitute at least 75% of a

school district's operating budget.  The plaintiffs presented no evidence to support

this claim, except for one legislator's general opinion voiced in a 2007 e-mail

message to Dr. Melmer without any specifics. The CPI is a commonly used measure of inflation frequently relied upon in a number of legal contexts. *See, e.g.*, *Enchanted World Doll Museum v. Buskohl*, 398 N.W.2d 149, 150 (S.D. 1986) (CPI used as a basis for inflationary adjustments in a contract for deed); SDCL 62-4-7 (increases in workers' compensation benefits based upon the CPI); A.R.S.D. 74:07:01:07 (dollar amounts for environmental financial assurance adjustable based upon the CPI). *See also Campbell Cnty. II*, 19 P.3d at 549 n.32 (CPI used in a school funding case to document annual inflation rates and the erosion of purchasing power from 1995 to 2000). Absent more persuasive evidence of its inadequacy, using the CPI as a measure of inflation does not render the funding formula unconstitutional. On this record, the plaintiffs have not shown that inflationary conditions skewed the formula or that the funding formula is unrelated to actual costs.

[¶33.] The plaintiffs next assert that the replacement of the small school factor with the small school adjustment in 2007 eliminated an annual inflationary increase for smaller school districts. The small school factor and small school adjustment contemplate economies of scale; that is, smaller districts incur greater cost per student than larger districts. The small school factor utilized a schedule of multipliers to artificially increase the enrollment of school districts with fewer than 600 students. *See* SDCL 13-13-10.1(2). For example, school districts with fewer than 200 students multiplied their enrollments by 1.2. SDCL 13-13-10.1(2)(a). That product was then multiplied by the PSA, as annually adjusted for inflation, to arrive at local need. SDCL 13-13-10.1(5) (Supp. 1996). The 2007 amendments

changed this calculation. Enrollments are no longer artificially increased; actual enrollment figures are used instead. *See* SDCL 13-13-10.1(2A), -10.1(5). Smaller school districts simply receive an additional fixed per pupil amount according to a statutory sliding scale maximizing at $847.54 and declining as enrollments grow to 600. SDCL 13-13-10.1(2C), -10.1(5). There is no provision for an annual inflation adjustment to this fixed per pupil amount. Thus, small school districts do lose the benefit of an inflationary increase in their special adjustment every year.[28]

[¶34.] Finally, the plaintiffs contend that opt outs, intended as an education enhancement mechanism, have instead become a tool of survival for many school districts. Since a school board's decision to opt out can be referred (*see* SDCL 10-12-43), the plaintiffs claim the decision to adequately fund education defaults to a majority vote of local taxpayers in violation of the constitution.

[¶35.] The constitution makes funding education both a state *and* local school district responsibility. S.D. Const. art. VIII, § 15. *See also Olson v. Guindon*, 2009 S.D. 63, 771 N.W.2d 318. It requires the Legislature to make provision "by general taxation and by authorizing the school corporations to levy such additional taxes as

---

28. The State contends that, despite the loss of this inflationary increase, the overall package of legislative changes to the school funding formula in 2007 actually benefitted smaller schools. However, the testimony was equivocal on this point, the defense expert conceding, "It's - - the formula is so complex. Again, it would depend on whether they had a decline in student numbers. It's not just the dollars in the formula. There's other pieces of it too." We agree. The formula is complex. As noted by the Wyoming Supreme Court in regard to that state's school funding formula in *Campbell County I*, "'[i]f lack of clarity alone were sufficient to strike these statutes down, this case would be less difficult.'" 907 P.2d at 1248 (quoting *Roosevelt Elem. School Dist. v. Bishop*, 877 P.2d 806, 809-10 (Ariz. 1994)).

with income from the permanent school fund shall secure [the school system] . . . ." S.D. Const. art. VIII, § 15. Ultimately, however, the constitution imposes the duty on the Legislature alone to "maintain" the school system and to devise the state and local tax system that will "secure" it. S.D. Const. art. VIII, §§ 1, 15. Whatever system the Legislature devises, therefore, must be sufficient to ensure the funding of a constitutionally adequate school system in every school district. A referendum conflicts with this constitutional requirement if it permits the voters in a district to reject taxes or levies *necessary* to fund a constitutionally adequate school system in the district.

[¶36.]     If an opt out is necessary to fund a constitutionally adequate school system, it may be problematic, especially if the opt out fails at the voting booth. Based upon the testimony provided, however, nearly all of the focus districts[29] attempting opt outs ultimately were able to pass them. The exception was the Bon Homme School District which, despite the rejection of two opt out attempts in 2000-2001, continued to operate until the time of trial, continued to provide the required curriculum, and produced academic results consistent with the other focus districts.

---

29.     During discovery, the parties entered into an agreement regarding the selection of "focus districts" for analyzing the education system. The focus district agreement was not required by the trial court. The plaintiffs initially selected eleven and the State ten focus districts. Prior to trial, the plaintiffs dropped five of their focus districts and the trial court ruled any evidence on those districts offered by the State was irrelevant. Thus, at trial, the plaintiffs offered evidence as to their six remaining focus districts: Faith; Florence; Doland; Bon Homme; Willow Lake; and Rapid City. The State offered evidence as to their ten focus districts: Sanborn Central; Miller; Avon; Faulkton; Hamlin; Sisseton; White River; McLaughlin; Shannon County; and Flandreau.

We find this record insufficient to demonstrate a constitutional violation in the referral of any particular opt out.

### *Educational Results as a Factor in Constitutional Determination*

[¶37.]     Even if there are flaws and inadequacies in the school funding formula and opt out provision, the plaintiffs still must show the correlation between funding levels and a constitutionally adequate education. Thus, educational results are also a factor in determining constitutionality of the system.  In other words, are the students receiving the education required by the constitution?  The plaintiffs must prove that the system fails to provide South Dakota school children with an education that gives them the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually.  The plaintiffs focus on educational resources and academic results to prove their case.

### *Educational Resources*

[¶38.]     The plaintiffs concentrate on the conditions of their six focus school districts to support their contention of inadequate resources: Faith; Doland; Florence; Bon Homme; Willow Lake; and Rapid City.

[¶39.]     Testimony as to conditions in these districts mainly came from their superintendents.[30]  Common themes emerged: insufficient funding resources provided by the current school funding system; a resultant inability to meet ongoing funding obligations; and a lack of realistic options for increased funding.  Due to low tax bases and rising costs for items such as insurance and fuel, the superintendents testified their districts were running out of funds and depleting their reserves.  Some districts were surviving only with the benefit of successful opt outs while still others had been unable to pass opt outs and were facing future funding uncertainty.  According to the superintendents, consolidation was not an option for most of their districts because of the distances involved and student travel times.

[¶40.]     The superintendents testified that over time these declining economic conditions led to waves of budget cutbacks as well as numerous programming and staffing cuts.  Advanced, college prep, gifted, foreign language, and arts programs were common casualties.  Some of the districts cut technical and agriculture programs even in agriculture-based areas.  Out of necessity, the districts were moving toward increased reliance on distance learning over DDN, an interactive educational video network.  In the superintendents' estimation, however, the DDN programs met with mixed results. Extracurricular programs also faced cutbacks, consolidation with neighboring districts, or elimination altogether.  Cutbacks were

---

30.    Testimony in this area concerning the Rapid City Area School District was provided by a former school board member rather than the district's superintendent.  Nevertheless, his testimony echoed that of the superintendents' and is incorporated in this discussion.

also leading to more resource issues in some districts such as outdated textbooks and library books.

[¶41.] The negative impact of staffing cutbacks was another common theme among the superintendents. Because of staff cuts and understaffing, remaining teachers and administrators were forced to take on larger classes and increased workloads with less time for individual students. At the same time, they endured stagnant or frozen salaries. Some of the superintendents testified that the cutbacks caused morale issues and teacher burnout leading to resignations and increased turnover.

[¶42.] Teacher salaries were a consistent area of concern in these focus districts. The superintendents repeatedly testified that low or noncompetitive salaries caused an inability to recruit and retain qualified teachers. They perceived this as contributing to an overall decline in qualified applicants and to inexperienced teaching staffs.

[¶43.] Some of the superintendents testified to more unique challenges. Doland, Bon Homme, and Willow Lake maintained schools serving Hutterite Colonies. Those superintendents relayed their special hardships in providing adequate services to their economically disadvantaged and low English proficiency students.

[¶44.] Other focus districts faced special difficulties with deteriorating or inadequate facilities. Insufficient handicap access was one common point of testimony in this area while roof and basement leaks were another. Doland's superintendent raised various safety issues, and Florence's superintendent testified

to a number of maintenance and space issues and a lack of air conditioning. Willow Lake's superintendent provided similar testimony including complaints of rusty water pipes.

[¶45.] Faith's superintendent testified to that district's acute facility problems. Its 1919 school building was condemned in 2004. The district provided replacement quarters in the form of seven modular classrooms which continued to be utilized through the time of trial. The superintendent provided extensive testimony on the district's financial inability to build a new school structure and as to the unique problems posed by the modular classrooms in terms of overcrowding, cleaning, maintenance, and safety as well as their responsibility for declining student morale.

[¶46.] The State relies on more positive evidence of conditions in the focus districts. The State points to the districts' ability to maintain healthy general fund and capital outlay reserve balances despite their fiscal issues. The State also argues that opt outs were still available in some of the districts to increase funding. Moreover, some districts were not levying at the maximum limit for general funds or capital outlay funds, including some districts that had already passed opt outs. In addition, student populations were declining in a number of districts while property valuations were rising, adding some boost to local tax bases.

[¶47.] The State emphasizes the potential for consolidation as a means of addressing funding issues. Through cross-examination, the State established consolidation was a more feasible option for some districts than initially conceded by their superintendents. This was particularly true for those districts already

engaged in a level of inter-district cooperation in areas such as technical education, athletics, and other extracurricular activities.

[¶48.] The State also points to evidence that some of the districts could have more advantageously used other available funding sources. For example, some districts were using general funds for state retirement fund contributions instead of pension funds. Use of pension funds would have left more general funds available in those districts for education purposes. Other districts were not maximizing use of their capital outlay funds. Increased capital outlay funds could have assisted not only in addressing some of the districts' facility issues but also in purchasing equipment, computers, software, textbooks, and library books.

[¶49.] In terms of more significant facility issues, neither Faith nor Willow Lake had attempted bond issues while Florence had already had a successful bond election. The State also asserts some districts were maintaining more facilities than necessary. In this regard, the State argues that the districts are under no legal obligation to maintain separate Hutterite Colony schools, that Bon Homme does not need four separate attendance centers within its narrow geographic confines, and that Willow Lake need not maintain a community wellness center at district expense.

[¶50.] Overall, the State disputes that conditions in the plaintiffs' focus districts represent conditions in the state school districts as a whole. The State relies, in part, on testimony from Dr. Melmer. Dr. Melmer said he visited over a hundred school districts throughout the state and did not believe the facility problems in the focus districts were indicative of most school districts. He

particularly described the trailer situation in Faith as unlike anywhere in the state and pointed out that the facilities in the focus districts varied. For example, he characterized Rapid City's facilities as excellent. While acknowledging teacher shortages in key areas at the high school level, Dr. Melmer did not believe the overall situation was as severe as described in the focus district testimony. In terms of resources, Dr. Melmer testified he had not seen outdated textbooks in his visits and described classrooms as having good technology and updated materials. In Dr. Melmer's opinion, the focus districts' problems did not represent South Dakota school districts overall.

[¶51.]     Relying upon Dr. Melmer's testimony and its other experts, the State argues that many school districts have been able to provide a very solid and good environment for teaching and learning. The districts have provided adequate and in some cases, exemplary, facilities and resources, through modern technology, distance learning, and highly qualified teachers.[31]

[¶52.]     The State highlights evidence that all of the 161 school districts met their state imposed accreditation and curriculum standards. School districts must be accredited (SDCL 13-13-18; A.R.S.D. 24:43:02:01); and to maintain accreditation they must meet a number of curriculum requirements (A.R.S.D. ch. 24:43:11). Schools in South Dakota meet or exceed the minimum state required curriculum

---

31.    In terms of teaching resources, the data reflects that: only 1.6% of all core content areas are not being taught by highly qualified teachers as ranked for NCLB purposes (down by 9.7% since 2003); every teacher in South Dakota has a bachelor's degree and a growing percentage have master's degrees; South Dakota teachers possess an average of fifteen years of experience and only 12% at the time of trial had less than three years of experience.

and, at the time of trial, all of them offered the distinguished track curriculum consisting of ACT recommended core classes for college bound students. On a statewide basis, South Dakota schools also offer various career and technical education (CTE) courses such as agriculture and natural resources, business management and family and consumer science.

### *Academic Results*

[¶53.] In terms of academic results, the plaintiffs cite National Assessment of Educational Progress (NAEP) and DakotaSTEP test scores. Every state in the country administers NAEP tests in reading and math to their fourth and eighth grade students. The plaintiffs claim the NAEP test results show that less than half of our students are proficient in the categories tested.

[¶54.] The DakotaSTEP tests are part of South Dakota's educational assessment and accountability system under NCLB.[32] The tests measure student

---

32. The plaintiffs assert meeting state imposed academic standards and achievement requirements such as those under NCLB is part of the standard for an adequate, basic quality education under the South Dakota Constitution. However, the Legislature may impose education standards beyond those required by the constitution. *See Breck v. Janklow*, 2001 S.D. 28, ¶ 9, 623 N.W.2d 449, 454 (stating the legislative power is unlimited except as it is limited by the state and federal constitution) (citing *Wyatt v. Kundert*, 375 N.W.2d 186, 190-91 (S.D. 1995)). Further, "[t]he legislature cannot define the scope of a constitutional provision by subsequent legislation." *Poppen v. Walker*, 520 N.W.2d 238, 242 (S.D. 1994). Nevertheless, education standards have clearly advanced since the writing of the constitution. As early as 1931, this Court recognized: "What would have been considered a good average education in 1881 would not be so considered today. Standards of education have advanced, and methods of teaching have changed." *State ex rel. Prchal v. Dailey*, 57 S.D. 554, 234 N.W. 45, 47 (1931). Because the Legislature is "'uniquely equipped'" to evaluate and respond to such issues of public policy and to make choices as to what is involved in providing a basic education, compliance with state imposed academic

(continued . . .)

proficiency in reading and math according to standards approved by the United States Department of Education and the SDDOE. The tests are given annually to students in grades three through eight and eleven. The plaintiffs point out that DakotaSTEP results indicate, on a statewide basis, approximately one out of every four students is not proficient in math. The plaintiffs particularly emphasize the lack of student proficiency in their six focus districts and three of the State's focus districts.[33] The plaintiffs also cite evidence that South Dakota school districts fail

---

( . . . continued)
standards and achievement requirements is relevant as one measure of compliance with the constitution. *See Vincent v. Voight,* 614 N.W.2d 388, 407 (Wis. 2000) (quoting *Kukor,* 436 N.W.2d at 583 n.14).

33. The results are summarized as follows:

### Rapid City School District

#### 2008 Results

Percentage of all students not proficient in math............................33.3%
Nat. Am. 11th graders not proficient in math ...............................69%
Nat. Am. 11th graders not proficient in reading ............................63%

### Faith School District

#### 2007 Results

11th graders not proficient in math ................................................50%
11th graders not proficient in reading ...........................................44%

#### 2008 Results

11th graders not proficient in math ................................................40%
(continued . . .)

_____

( . . . continued)

11th graders not proficient in reading ...........................................45%

## Doland School District

### 2007 Results

11th graders not proficient in math .............................................67%
11th graders not proficient in reading ..........................................39%

### 2008 Results

11th graders not proficient in math .............................................66%
11th graders not proficient in reading ..........................................50%

## Florence School District

### 2007 Results

11th graders not proficient in math .............................................62%
11th graders not proficient in reading ..........................................71%

### 2008 Results

11th graders not proficient in math .............................................25%
11th graders not proficient in reading ..........................................25%

## Bon Homme School District

### 2007 Results

11th graders not proficient in math .............................................25%
11th graders not proficient in reading ..........................................38%

### 2008 Results

11th graders not proficient in math .............................................37%
11th graders not proficient in reading ..........................................41%

## Willow Lake School District

### 2008 Results

(continued . . .)

_____

( . . . continued)

5th graders not proficient in math ...............................................54%
5th graders not proficient in reading ..........................................38%
11th graders not proficient in math .............................................33%
11th graders not proficient in reading ........................................40%

### *White River School District*

#### 2007 Results

Percentage of all students not proficient in math...........................56%
Nat. Am. Students not proficient in math.....................................62%
11th graders not proficient in math ...............................................89%
11th graders not proficient in reading ..........................................62%
Nat. Am. 11th graders not proficient in math .............................93%
Nat. Am. 11th graders not proficient in reading ..........................71%

#### 2008 Results

Percentage of all students not proficient in math...........................56%
Nat. Am. Students not proficient in math.....................................65%
Nat. Am. 11th graders not proficient in math ..............................71%
Nat. Am. 11th graders not proficient in reading ..........................64%

### *McLaughlin School District*

#### 2007 Results

Percentage of all students not proficient in math...........................49%
11th graders not proficient in math ...............................................74%
11th graders not proficient in reading ..........................................74%

#### 2008 Results

Percentage of all students not proficient in math...........................50%
11th graders not proficient in math ...............................................70%
11th graders not proficient in reading ..........................................65%

### *Shannon County School District*

#### 2007 Results

(continued . . .)

to meet adequate yearly progress goals as required by state law. The goals are designed to advance students who lack basic proficiency in math and reading. In particular, the plaintiffs emphasize the poor performance of Native American students. The 2008 state report card showed 52% of all Native American students in the state were not proficient in math and 38% were not proficient in reading.

[¶55.] The State argues that academic results need to be viewed on a statewide basis rather than just in the focus districts. A statewide view offers a more positive picture. The high statewide attendance and graduation rates compare well at a national level. The statewide DakotaSTEP results for 2008 indicate that 84% of all children were proficient or advanced in reading while 76% were proficient or advanced in math. South Dakota students score above-average on ACT tests and a high percentage of high school graduates attend some form of post-secondary education. The State minimizes the poor results of the eleventh grade DakotaSTEP tests. Witnesses surmised that eleventh graders lacked incentive to excel on the tests because it did not impact their college eligibility or other post-high school opportunities. This pattern emerged in other states also.

[¶56.] Plaintiffs emphasize deficiencies in the funding system and questionable achievement results. The State emphasizes positive state-wide results.

_____

( . . . continued)

Percentage of all students not proficient in math............................68%
Nat. Am. Students not proficient in math......................................68%

2008 Results

Percentage of all students not proficient in math............................70%
Nat. Am. Students not proficient in math......................................71%

What level of achievement equates to a constitutional mandate is not clearly evident to this Court. The standards set by the SDDOE offer guidance, but are not alone determinative. Questions also loom concerning the disparity among districts and the educational opportunities they provide. Some districts are clearly struggling and, by their own estimation, offer less than a quality education. Although additional funding could remove some of the inadequacies, other factors impact the results. Even assuming the deficiencies, the weakest link in the plaintiff's constitutional challenge is tying the funding to the results.

### *Correlation Between Funding and Results*

[¶57.] Of the sixteen focus school districts the parties analyzed, Hamlin School District had the lowest per student expenditure in general funds in FY 2007 of $5,353. Yet, 87.5% of Hamlin's students tested proficient or advanced in reading and 82.6% tested proficient or advanced in math. Assuming a correlation between funding and results, Hamlin should have been the poorest or one of the poorer performing focus districts in 2007. It was not. Moreover, Hamlin achieved these results while 42% of its students qualified for free or reduced lunches, a measure of the economically disadvantaged student population in the district.

[¶58.] Rapid City had the next lowest spending per student in FY 2007 at $5,432 per student. While its overall math scores in 2007 were poor with only 66.7% of the students testing as proficient or advanced, reading scores were competitive with 80.4% of the students testing in the proficient or advanced category. Among the Rapid City students, 31.5% qualified for free or reduced lunches.

[¶59.] The third lowest spending focus district in FY 2007 was the Miller School District at $5,598 per student. Again, assuming a correlation between funding and results, one would expect poor performance of Miller's students. To the contrary, Miller's scores were the highest of all of the focus districts with 84% of the students testing as proficient or advanced in math and 89.5% testing as proficient or advanced in reading. As for its economically disadvantaged population, 32.3% of the Miller students qualified for free or reduced lunches.

[¶60.] At the other end of the spectrum, the Shannon County School District had the highest spending of the focus districts in FY 2007 at $12,889 per student, over twice the per student spending of the Hamlin School District. Once again, assuming a correlation between funding and results, Shannon County should have been one of the better performing focus districts in 2007. That was not the case. Only 32.2% of its students tested proficient or advanced in math while only 53.5% of them tested proficient or advanced in reading–the worst results of any of the focus districts. Notably, 100% of the Shannon County students qualified for free or reduced lunches.

[¶61.] Like Shannon County, McLaughlin, the second highest spending focus district that year, posted test results among the worst, only 50% of the students tested proficient or advanced in math and 60% tested proficient or advanced in reading. McLaughlin School District spent $10,642 per student, nearly twice the per student spending of Hamlin School District. Also like Shannon County, 100% of the McLaughlin students qualified for free or reduced lunches.

[¶62.]    At trial, Dr. Melmer provided additional examples of focus district performances where funding amounts did not correlate with student results. White River was the third highest spending focus district in 2007 at $9,716 per student. Yet, it had some of the poorest test results in line with Shannon County's and McLaughlin's. Dr. Melmer also indicated that Hamlin and Willow Lake were "side-by-side" districts, and that Hamlin spent "well below" Willow Lake while achieving test scores "at or above" Willow Lake's. He identified a similar pattern between the neighboring Avon and Bon Homme School Districts where spending in Avon was "quite a bit less," yet achieved test scores similar to Bon Homme's.

[¶63.]    The State's experts generally downplayed a results-funding correlation. The experts conducted statistical analyses of test scores and school district funding over several years in South Dakota. One expert found no correlation between a district's total expenditures and its test scores, even after adjusting for socioeconomic circumstances affecting students such as poverty, English language learner status, race, and ethnicity. The expert concluded that, while socioeconomic circumstances had significant negative effects on achievement, school resources, including expenditures, had no significant effect. After analyzing the statistical information in a variety of ways, the expert concluded:

> No matter how you look at the data, no matter what techniques you use, the data is very strong, it's very consistent. Achievement patterns in South Dakota are being influenced heavily by students' family background characteristics and school resources that we can measure, that we have measured, which includes most of the resource measures that experts have looked at throughout the country. Those resources do not by and large have significant effects. And the one that does have a significant effect is a very small effect compared to SES [*i.e.* socioeconomic circumstances]. So very, very hard in South

Dakota to change achievement by changing resource levels according to these studies.

He had found similar results in studies he had conducted in other states.

[¶64.] Another State expert concluded that, "across grades, across achievement areas, reading and math, across years, we don't see any relationship between spending per pupil and achievement in South Dakota schools." He claimed this observation mirrored results of thirty of the best national studies, which found that "attempts to improve achievement just by putting more resources into the schools and the classrooms have been ineffective . . . [and] have not led to higher [student] achievement[.]"

[¶65.] As additional support for their conclusions, these experts referred to New Jersey and Wyoming experiences where student expenditures were significantly increased over time without measurable improvements in student achievement. One of the experts also referred to national spending having tripled between 1970 and 2000 while student performance remained level.

[¶66.] Several of the witnesses agreed that poor student achievement is impacted by factors other than funding, such as parental issues, environmental issues, attendance issues, instructional programs, and internal resource allocation. Of particular concern was how to improve the performance of economically disadvantaged students. Although additional funding for pre-kindergarten programs may be one way of addressing the problem–as one expert advocated–most of the experts agreed that the achievement gap for economically disadvantaged students exists in every state in the nation. A complex set of socioeconomic factors and experiences contributes to the achievement gap, and no other state has been

able to eliminate the gap, including those spending nearly twice the average per pupil amount that South Dakota spends.

[¶67.]        The testimony and evidence raises questions about the correlation between the level of funding and student achievement. On this record, the correlation between the school funding system and poor academic results is not readily apparent. Contrast this with the evidence before the New York Court of Appeals in *Campaign for Fiscal Equity, Inc. v. State of New York,* where the court found funding for the New York City schools did not meet constitutional requirements, but emphasized the "unique combination of circumstances" that permitted the plaintiff/appellants to prevail:

> New York City schools have the *most* student need in the state and the *highest* local costs yet receive some of the *lowest* per-student funding and have some of the *worst* results. Plaintiffs in other districts who cannot demonstrate a similar combination may find tougher going in the courts.

801 N.E.2d 326, 350 (N.Y. 2003) (emphasis original).

### CONCLUSION

[¶68.]        We hold that the South Dakota Constitution guarantees all South Dakota children a free, adequate, and quality public education which provides them with the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. Here, because the plaintiffs are challenging the constitutionality of the state education funding system, they have a high burden to meet. They have to overcome the presumption of constitutionality. They have to show that the state funding system is "clearly and unmistakably" unconstitutional and "there is no reasonable doubt

that it violates fundamental constitutional principles." *South Dakota Ass'n*, 280

N.W.2d at 664-65. They have to show that the Legislature's system of funding fails

to provide children of the state with an adequate and quality education, that is, it

fails to give them the opportunity to adequately prepare for their future roles as

citizens, participants in the political system, and competitors both economically and

intellectually. The plaintiffs' evidence raises serious questions about whether the

state aid formula is based on actual costs and whether local taxing procedures and

caps might have constitutional implications. The plaintiffs have also shown some

groups of students are not achieving at desired levels and that some districts

struggle to provide adequate facilities and qualified teachers. Even so, reasonable

doubt exists that the statutory funding mechanisms or level of funding are

unconstitutional. We are unable to conclude that the education funding system (as

it existed at the time of trial) fails to correlate to actual costs or with adequate

student achievement to the point of declaring the system unconstitutional. We

affirm the trial court.[34]

---

34. Relying on federal justiciability analysis, the State argues this Court should
not address the merits of the constitutional issue in this case on the basis
that it poses a non-justiciable political question. *See Baker v. Carr*, 369 U.S.
186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). We reject this argument. The
Connecticut Supreme Court recently cited decisions from nine states in
observing that "the vast majority of jurisdictions 'overwhelmingly' have
concluded that claims that their legislatures have not fulfilled their
constitutional responsibilities under their education clauses are justiciable."
*Conn. Coal. for Justice in Educ. Funding,* 990 A.2d at 225 n.24 (citing
decisions from Kentucky, Massachusetts, Idaho, Colorado, Indiana, Montana,
North Carolina, Ohio, and Texas). *See also State v. Campbell Cnty. Sch. Dist.
(Campbell County III)*, 32 P.3d 325, 333-37 (Wyo. 2001) (rejecting the position
that school finance issues are nonjusticiable political questions). The
Colorado Supreme Court held school funding claims to be justiciable in

(continued . . .)

[¶69.]     KONENKAMP, ZINTER, and SEVERSON, Justices, concur.

[¶70.]     GILBERTSON, Chief Justice, concurs in result.

[¶71.]     WILBUR, Justice, not having been a member of the Court at the time

this action was submitted to the Court, did not participate.


GILBERTSON, Chief Justice (concurring in result).

[¶72.]     The Court holds today that Plaintiffs have failed to establish beyond a

reasonable doubt a constitutional violation of Article VIII of the South Dakota

Constitution.  I agree.  The meaning of Article VIII and its history do not support

the heightened legal interpretations advocated by Plaintiffs.  Furthermore,

Plaintiffs have not shown that the trial court's findings of fact were clearly

erroneous or conclusions of law were in error.  Having failed on both the factual and

legal claims, I would not reach the issue of causation.  For these reasons, I concur in

result.

### THE LEGAL ISSUE

[¶73.]     Although the issues in this proceeding appear to have undergone

several changes throughout the course of this litigation, I agree with the Court that

---

( . . . continued)

> *Lobato v. State*, 218 P.3d 358 (Colo. 2009).  Part of its rationale was that "it is
> the province and duty of the judiciary to interpret the [state constitution] and
> say what the law is." *Id*. at 372.  The court declined to follow federal
> justiciability analysis because of the broader jurisdiction bestowed on state
> courts versus the limited jurisdiction of federal courts. *Id*. at 370.  This Court
> has previously asserted the same prerogative of constitutional interpretation
> as the Colorado court and we do so here. *See Brendtro*, 2006 S.D. 71, ¶ 19,
> 720 N.W.2d at 676 n.3 (stating this Court is charged with the ultimate
> interpretation of the South Dakota Constitution).

(continued . . .)

Plaintiffs now seek a declaratory ruling that Article VIII, Sections 1 and 15 of the South Dakota Constitution mean: (1) "that the South Dakota Constitution entitles all children to a free, adequate and quality public education"; and, (2) "that the present system of funding is unconstitutional because it does not provide all children with an adequate and quality education." Plaintiffs go further, however, and based upon cases from other jurisdictions, seek recognition of an enhanced status for education as a "fundamental right."[35]

[¶74.]     Unlike cases in some other states, Plaintiffs do not seek an order from this Court for monetary relief directed towards the Legislature. This is appropriate because in *Olson v. Guindon*, 2009 S.D. 63, ¶ 23, 771 N.W.2d 318, 324 (Gilbertson, C.J., concurring), the appellants conceded that "there is no Constitutional authority for this Court to declare itself to be some kind of 'super school board,' that is now . . . de facto, running the education system of South Dakota." Neither are we a "super legislature" constitutionally empowered to make school funding decisions. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 31, 93 S. Ct. 1278, 1295, 36 L. Ed. 2d 16 (1973). This is recognition that the doctrine of separation of powers has been "fundamental bedrock" to the successful operation of our state government

---

( . . . continued)

35.     *See, e.g.*, *Horton v. Meskill*, 376 A.2d 359, 373 (Conn. 1977); *Pauley v. Kelly*, 255 S.E.2d 859, 878 (W. Va. 1979); *Washakie Cnty. Sch. Dist. No. 1 v. Herschler*, 606 P.2d 310, 333 (Wyo. 1980).

since South Dakota became a state in 1889. *Gray v. Gienapp*, 2007 S.D. 12, ¶ 19,

727 N.W.2d 808, 812.[36]

***The Historical Background of Article VIII, Sections 1 and 15***

[¶75.]    The significance of the history behind this constitutional provision and

how it was subsequently implemented is crucial to an analysis of Plaintiffs' legal

claims. In the course of their legal argument, Plaintiffs relied heavily on such

analysis. This constitutional history establishes that Article VIII sets an

educational floor which allows the Legislature, in its discretion, to address the

subject of additional state aid to education as part of its constitutional prerogatives.

[¶76.]    "The Constitution is the mother law. It is not the baby. Statutes must

conform to the Constitution, not vice versa." *Poppen v. Walker*, 520 N.W.2d 238,

242 (S.D. 1994) (overruled on other grounds) (quoting *Cummings v. Mickelson*, 495

N.W.2d 493, 507 (S.D. 1993) (Henderson, J., concurring in part and dissenting in

part). Our constitutional provisions are a limitation on legislative authority, not a

grant of power to the Legislature. *Gray*, 2007 S.D. 12, ¶ 22, 727 N.W.2d at 813;

*Breck v. Janklow*, 2001 S.D. 28, ¶ 9, 623 N.W.2d 449, 454. As such, legislative

enactments concerning education and its funding are presumed to be constitutional.

*See City of Pierre v. Blackwell*, 2001 S.D. 127, ¶ 9, 635 N.W.2d 581, 584 ("it is well

settled in this state that any legislative enactment is presumed reasonable, valid

and constitutional").

---

36.    Contrary to the claim of the State, and as set forth by the Court today, this
       Court is not without jurisdiction under the separation of powers or political
       question doctrines. *Gray*, 2007 S.D. 12, ¶ 18, 727 N.W.2d at 812. *See also*
       *Baker v. Carr*, 369 U.S. 186, 197, 82 S. Ct. 691, 699, 7 L. Ed. 2d 663 (1962).

[¶77.]     "[T]he object of constitutional construction is 'to give effect to the intent of the framers of the organic law and the people adopting it.'" *Doe v. Nelson*, 2004 S.D. 62, ¶ 12, 680 N.W.2d 302, 307 (quoting *Poppen*, 520 N.W.2d at 242). "Where a constitutional provision is quite plain in its language, we construe it according to its natural import." *Brendtro v. Nelson*, 2006 S.D. 71, ¶ 16, 720 N.W.2d 670, 675. However, both parties concede that the text of Article VIII is not sufficiently specific to allow resolution of this suit by merely looking to the words of the text. Such terms of Article VIII, Sections 1 and 15 as "a general and uniform system of public schools," "adopt all suitable means to secure the people the advantages and opportunities of education" and a "thorough and efficient system of common schools" are not drawn as to allow an absolute definition.[37] As such, it is appropriate that

---

37.     Language and its meaning can change with time. The Wyoming Supreme Court referenced an 1889 dictionary to aid in interpretation of some of the terms which are now before us:

> Uniform: Having always the same form;
>
> System: Any combination of assemblage of things adjusted as a regular and connected whole;
>
> Thorough: Fully executed; having no deficiencies; hence, complete in all respects; unqualified; perfect;
>
> Efficient: Acting or able to act with due effect; adequate in performance; bringing to bear the requisite knowledge, skill, and industry; capable, competent.

*Campbell Cnty. Sch. Dist. v. State*, 907 P.2d 1238, 1258 (Wyo. 1995) (citing The Century Dictionary (1889)).

Other terms now before us can be found in case law from that era:

(continued . . .)

we look to secondary sources. *Brendtro*, 2006 S.D. 71, ¶ 16, 720 N.W.2d at 675; *Doe*, 2004 S.D. 62, ¶ 10, 680 N.W.2d at 305-06. This includes the intent of the drafting bodies and the historical context of the provision. *Doe*, 2004 S.D. 62, ¶ 10, 680 N.W.2d at 305-06.

[¶78.] Dakota Territory was created in 1861. Only months later, at its first meeting, the Dakota Territorial Legislature passed a comprehensive act creating the first territorial-wide educational system. 1862 Dak. Terr. Sess. Laws ch. 81. Free access to public education was addressed:

> The district schools established under the provisions of this act, shall at all times be equally free and accessible to all the white

---

( . . . continued)

> Advantage: Any state, condition, circumstance, opportunity, or means specially favorable to success, property, interest, reputation, or any desired end.

*Duvall v. State*, 166 N.E. 603, 604 (Ind. App. 1929) (citing Century Dictionary).

> Suitable: Reasonable.

*Headley v. Ostroot*, 76 S.D. 246, 249, 76 N.W.2d 474, 475 (1956); *State ex rel. Richards v. Burkhart*, 44 S.D. 285, 183 N.W. 870, 872 (1921).

> Opportunity: a fit or convenient time; a time favorable for the purpose, a convenience or fitness of time and place.

*In re Guardianship of Hause v. Wood*, 19 N.W. 973, 974 (Minn. 1884).

> General: Common to many, or the greatest number; widely spread; prevalent; extensive though not universal.

*Platt v. Craig*, 63 N.E. 595, 595 (Ohio 1902).

> General: Universal, not particularized; as opposed to special.

*Joost v. Sullivan*, 43 P. 896, 899 (Cal. 1896) (citing Black's Law Dictionary).

> children residents therein over five and under the age of twenty-one years, subject to such regulations as the district board in each may prescribe.

1862 Dak. Terr. Sess. Laws ch. 81, § 40.[38] As recounted in the Memoirs of Gen. William Henry Harrison Beadle, as the Dakota Territory grew so did its educational system. *See Personal Memoirs of General William Henry Harrison Beadle with Editorial Notes by Doane Robinson, in* 3 South Dakota Historical Collections 153-54 (1904).

[¶79.] The subject of education would play a significant part at the numerous attempts to achieve statehood for what was to become the State of South Dakota. Three constitutional conventions were held in 1883, 1885 and 1889 before statehood

---

38. It is unknown why the access to the schools was limited to "white children." While it could be the racial attitudes of the time, hopefully it was because the federal government had already assumed the responsibility for the education of Indian children. *See, e.g.*, Article 4 of the Treaty with Sioux - Sisseton and Wahpeton Bands (1851), *reprinted in* 1 South Dakota Codified Laws 80; Article 5 of the Treaty with the Sioux - Sisseton and Wahpeton Bands (1858), *reprinted in* 1 South Dakota Codified Laws 84.

was achieved. *See generally* David E. Gilbertson and David S. Barari, *Indexing the South Dakota Constitutional Conventions: A 21st Century Solution to a 125 Year Old Problem*, 53 S.D. L. Rev. 260 (2008).

[¶80.] The 1883 Convention sought to create a system of schools funded by income from the sale of public lands and "[t]he Legislature shall make such provision by taxation or otherwise, as with the revenue from the permanent school fund, shall secure a thorough and efficient system of common schools throughout the State." Constitutional Convention of 1883 Art. VIII, *reprinted in* 21 South Dakota Historical Collections 326-34 (Hipple Printing Co., 1942).[39] According to George W. Kingsbury, the proposed constitution of 1883 would serve as a model for the delegates of the next constitutional convention in 1885. Kingsbury, 2 *History of Dakota Territory: South Dakota – Its History and Its People* 1737 (George Martin Smith, ed., S.J. Clarke Publ. Co., 5 vols., 1915).[40]

---

39. Two of the few contested issues in the education debates in the 1883 Constitutional Convention concerned a proposal that "all able bodied children between the ages of seven and fourteen be required to attend school at least 3 months each year." Another proposal was that the "Legislature shall provide for uniformity of text books to be used throughout the public schools of this State, and there shall be no change in text books within five years from the date of adoption." Constitutional Convention of 1883 at 356. Such specific proposals were rejected while the more general terms such as "thorough" survived. *Id.* at 356-57.

40. The proposed Constitution of 1883 was overwhelmingly passed by the voters, 12,336 to 6,814. Kingsbury, *History of Dakota Territory, supra,* at 1716-17. The United States Senate also passed a bill allowing formal admission of South Dakota as a State. The House of Representatives, however, failed to act and it died.

[¶81.] More in-depth examination of the Constitutional Convention of 1885 is required because at that convention Gen. Beadle drafted the text of what later became Article VIII. This draft was initially adopted by the 1885 Convention. *Memoirs of Gen. Beadle, supra*, at 178, 214-15.[41] The text of the 1885 Convention was carried forward to the 1889 Constitutional Convention[42] which became Article VIII of the South Dakota Constitution[43] in 1889. 2 South Dakota Constitutional Debates 250-60 (Huronite 1907).[44]

---

41. Once again the Constitutional proposal was overwhelmingly passed by the voters, 25,138 to 6,527. Kingsbury, *History of Dakota Territory, supra,* at 1751. Once again it failed to gain Congressional approval.

42. Numerous provisions of the 1885 Constitution were carried forward to the 1889 Constitution and ultimately became enacted as part of the South Dakota Constitution. A significant concern in 1889 that cautioned against a total reliance upon the 1885 text was the Congressional Enabling Act of 1889, 25 Statutes at Large 676, ch. 180, "which created and prescribed the powers of the 1889 conventions, so often recognized as a limitation on the convention's deliberation . . . ." *McDonald v. Sch. Bd. of Yankton Indep. Sch. Dist. No. 1 of Yankton,* 90 S.D. 599, 606 n.3, 246 N.W.2d 93, 97 n.3 (1976). The Enabling Act does not control the interpretation of Article VIII. However, the Enabling Act did address education by stating, "[t]hat provision shall be made for the establishment and maintenance of systems of public schools, which shall be open to all the children of said states, and free from sectarian control."

43. The 1889 Constitution was hardly controversial at the ballot box. It was approved by the voters 70,131 to 3,267. Jon Lauck, *Prairie Republic – The Political Culture of the Dakota Territory 1879-1889*, 128 (University of Oklahoma Press 2010).

44. The trial court's legal research concluded that the South Dakota constitutional education article is distinct from nearly every other state constitution, including those found in surrounding states such as Minnesota, Montana, Wyoming and North Dakota. On appeal, Plaintiffs do not challenge this conclusion of law. According to Gen. Beadle, he drafted Article VIII based on the "ideas, suggestions and work" of the members of the Committee on Education. *Memoirs of Gen. Beadle, supra*, at 214. He had

(continued . . .)

[¶82.]     When reviewing the journals of the three constitutional conventions, the only source of significant debate in regards to education was the minimum price set for sale of public school lands. Looking both inside and outside the constitutional halls at contemporary histories such as Kingsbury and the Gen. Beadle Memoirs, the issue of education was not a clash of the titans; it was rather a consensus that public education should be free to all, at taxpayer expense, as it had been since 1861. Typical of the attitude of the times was a subsequent statement made by this Court in *State ex rel. Eveland v. Erickson*, 44 S.D. 63, 182 N.W. 315, 316 (1921). "[D]uring the whole history of our nation, religion and education have been recognized as the foundation pillars of American Civilization." *Id.* We have held that when construing the South Dakota Constitution, we "may also consider the circumstances under which a constitutional provision was formed, the general sprit of the times, and the prevailing sentiment of the people." *Poppen*, 520 N.W.2d at 246-47.

_____

( . . . continued)

previously traveled to other Midwestern states before 1885 and was familiar with their constitutional provisions on education. As draftsman of the 1885 education clause, he accepted the suggestions of the Committee members and, one must assume, borrowed from several states with which he was familiar. The text of Article VIII is the result of what he considered to be the best for the proposed State of South Dakota. *Id.* Other provisions of the 1885 and 1889 Constitutions may have been copied from other states as during the Constitutional Debates on the Bill of Rights, "[w]hen a comparison was made, it was usually with the constitutions of California, Illinois or Iowa." *Gilbert v. Flandreau Santee Sioux Tribe*, 2006 S.D. 109, ¶ 21 n.6, 725 N.W.2d 249, 257 n.6.

*Application of Article VIII's History to Present Case*

[¶83.]     Plaintiffs argue that statehood brought forth a new era in education and that much of the first legislative session in 1890 "was spent on the vastly important educational bill." However, when one reviews the first South Dakota Session Laws, there are no radical shifts in educational policy from the Territorial period. A review of the 1890 Session Laws indicates only two small enactments dealing with education; one requiring the teaching of the effect of alcohol on the human system and a second abolishing the State Board of Education. 1890 S.D. Sess. Laws chs. 82 & 83.[45] Instead, the 1890 Legislature dealt with the subject of education as with others by enacting a statute which carried over all Territorial Laws to the State laws unless repealed or amended. 1890 S.D. Sess. Laws 254, ch. 105. This theme was reinforced by this Court in the early case *In re State Census*, 6 S.D. 540, 62 N.W. 129 (1895). Therein we noted that:

> There appear to be three classes of provisions in the [C]onstitution. The first class embraces constitutional provisions negative and prohibitory in their character, and are self-executing. All the laws, therefore, in force when the constitution was adopted, in conflict with these provisions, were necessarily abrogated, and laws subsequently enacted in conflict therewith would necessarily be void, in so far as they conflict with such provisions.

*Id.* at 130. Yet, there is no suggestion that the Territorial Laws concerning education somehow ran afoul of Article VIII; instead they were carried forward.

---

45.     Five enactments concerning the sale and lease of School and Public Lands were also enacted which had nothing to do with the actual education of students. *See* 1890 S.D. Sess. Laws chs. 136, 137, 138, 139 & 140.

[¶84.]     This view of the history of our constitutional period has stood the test of time.  Jon Lauck's recent study of the pre-constitutional period of the 1880's unearths no major battles over the educational provision or, after statehood, any claims of failure to comply with Article VIII.  *See* Jon Lauck, *Prairie Republic – The Political Culture of the Dakota Territory 1879-1889* (University of Oklahoma Press 2010).

[¶85.]     This history indicates that Article VIII of the South Dakota Constitution did not chart a new path previously unknown in this jurisdiction.  The year 1889 did not usher in a revolution in education.  Rather, it was a continuum of the past with similar goals of improvement.  While the drafters were studious of constitutions adopted in other states, all three proposed constitutions were "home-grown" documents.

[¶86.]     Many of those who were in leadership positions at the Constitutional Conventions and spoke frequently on important subjects were to become the governors, legislators and judges of the new State of South Dakota.  *Wegleitner v. Sattler*, 1998 S.D. 88, ¶ 11 n.3, 582 N.W.2d 688, 692 n.3.  Thus, the new state officials were familiar with the text of Article VIII.  It seems inconceivable that delegates to the Constitutional Convention of 1889 would subsequently take their seats in the Governor's Chairs and the Legislatures of South Dakota and promptly ignore the oath they had taken to support the Constitution of the State of South Dakota which they had just authored months before.[46]  Rather it points to a belief

_____

46.     An example of the pre- and post-statehood continuity in education appears in *Capital Bank of St. Paul v. School District No. 85*, 6 Dakota 248, 42 N.W. 774

(continued . . .)

on the part of the early South Dakota government officials that the State was in compliance with its constitutional mandate.

[¶87.]    The early history of South Dakota after statehood is also consistent with that view.  In 1905, in the Fourth Annual Review of Progress of South Dakota, the South Dakota Historical Society declared, "All the state educational institutions, from the common schools to the university, as well as the private schools and colleges, are in a flourishing condition." *Fourth Annual Review of the Progress of South Dakota for 1905*, 3 South Dakota Historical Collections 33 (1906). Moreover, Gen. Beadle's 1906 Memoirs, frequently cited by Plaintiffs, evidence no thought that the State since 1889 was out of compliance with its constitutional educational obligations.  Instead, a jubilant Gen. Beadle declared, "[n]ever before in its history has the [S]tate of South Dakota been so prosperous as at the present time." *Memoirs of Gen. Beadle, supra,* at 239.

[¶88.]    There are no cases from this Court between 1889 to the present concerning claims such as are now before us, that being the issue of the State's failure to comply with funding mandates of Article VIII.[47]  However, this Court in

---

( . . . continued)

    (1889), where the Dakota Territorial Supreme Court held school boards possess only such powers as were expressly conferred on them by the Territorial Legislature and other powers must necessarily be implied to have been given them in order to carry out the purposes of their organization and are incidental to the exercise of the powers expressly granted to it or necessarily implied.  Such legal structure and limits were applied to the school districts after statehood as well.  *Stephens v. Jones,* 24 S.D. 97, 123 N.W. 705, 707 (1909).

47.    The State's compliance with Article VIII was challenged under an equal protection argument in *Deerfield Hutterian Ass'n v. Ipswich Board of*

(continued . . .)

an early case did recognize the authority of the Legislature over education including financial effects on taxpayers. *Stephens v. Jones*, 24 S.D. 97, 123 N.W. 705, 707 (1909). In *Stephens*, we held that absent a constitutional limitation, the Legislature had the inherent plenary power to create or alter school districts "although it may make taxation more burdensome." *Id.* Later, in *State ex rel. Finger v. Weedman*, 55 S.D. 343, 226 N.W. 348, 364 (1929), we did have occasion to comment that Article VIII, Section 1 was a "mandate to the Legislature to provide a system of schools wherein education in 'morality and intelligence' shall be given to all."

[¶89.]     Plaintiffs argue that various legislative enactments over the years "expressly recognized that, for the benefit of the people of the State of South Dakota and the improvement of this and future generations of youth, it is essential that all of our youth be given the fullest opportunity to learn and develop their intellect and their skills to become productive and contributing members of society."[48] This argument that subsequent legislative enactments amounted to a de facto amendment of Article VIII suffers from two flaws. First, as has been previously noted, the Constitution is the "mother law." *Poppen*, 520 N.W.2d at 242. Thus, the Legislature cannot define the scope of a constitutional provision by subsequent legislation. *Id.* Second, it is illogical to say that the Legislature has raised the

---

( . . . continued)

    *Education*, 468 F. Supp. 1219 (D.S.D. 1979). It was again challenged as an equal protection claim in Hughes County Sixth Circuit Court in *Bezdichek v. State*, 1994 S.D.C.C. 34, Hughes County Civ. No. 91-209 (S.D. 6th Jud. Cir. 1994). Both challenges were unsuccessful.

48.    SDCL 13-14-7, 13-6-2(1), 13-6-2(2), 13-6-2(3), 13-1-12.1 and 13-33-19 are some of the examples cited by Plaintiffs.

constitutional bar in education policy defining what constitutes an adequate education by enacting various statutes to that effect and yet simultaneously is the source of the problem by failing to create a mechanism which produces that quality of education it authorized. While the Legislature certainly has the constitutional prerogative to enact statutes which enhance the quality of an education, that is a far cry from saying it is mandated to do so by Article VIII.

[¶90.]      Justice Oliver Wendell Holmes Jr. observed that constitutional provisions must be allowed some play "for the joints of the machine." *Green v. Siegel, Barnett & Schutz*, 1996 S.D. 146, ¶ 32 n.11, 557 N.W.2d 396, 405 n.11 (quoting *Mo., Kan. & Tex. Ry. Co. of Tex. v. May*, 194 U.S. 267, 268, 24 S. Ct. 638, 639, 48 L. Ed. 2d 971 (1904)). Phrases such as "general and uniform," "all suitable means," "advantages and opportunities of education," and "thorough and efficient system of common schools" invite such an approach.

[¶91.]      Such words, however, are far from meaningless. At oral argument, the State suggested that the Legislature possessed the constitutional prerogative to cut its aid to the schools in half or eliminate it altogether. Such an argument is clearly at odds with the constitutional terminology adopted in 1889. *See, supra,* note 36. It is also not supported by the historical background as discussed herein. Constitutions are enacted to prohibit something or to authorize something. *See, e.g., Apa v. Butler*, 2001 S.D. 147, ¶ 36, 638 N.W.2d 57, 70. They are not drafted to be purposeless or accomplish nothing. *In re McKennan's Estate*, 25 S.D. 369, 126 N.W.611, 617 (1910) ("Constitutions are supposed to be prepared with much care

and deliberation.  It will not do to assume that such important instruments contain any idle or meaningless phrases.").

[¶92.]      Thus, if a constitution has a meaning, what is that meaning?  Are we to declare that South Dakota is permanently stuck in the school system of 1889 with its country school houses, chalk slates and McGuffey Readers?  Certainly not. This Court's balancing of the application of the scope of Article VIII and the changing trends in education was examined in *State ex rel. Prchal v. Dailey*:

> What would have been considered a good average education in 1881 would not be so considered today.  Standards of education have advanced, and methods of teaching have changed.  But we think it is elementary that the people through their Legislature and the Constitution have a right to control and prescribe the limits to which they will go in supplying education to the children and youth of the state at public expense.  Neither educators nor administrative boards can expend public funds for education, unless the education for which it is expended is authorized by law.

57 S.D. 554, 234 N.W. 45, 47 (1931).

[¶93.]          While Plaintiffs mount an impressive public policy argument based on equitable principles, this is not an equitable issue.  Rather, it is an issue of construction of our Constitution which alone controls the resolution of this case. There certainly is room in the drafting of Article VIII for a difference of legal opinions.  However, in this Court's sole early review of Article VIII, we stated that a statute will be declared unconstitutional in violation of Article VIII only when we are satisfied beyond a reasonable doubt that it conflicts with that article.  *In re State Bonds*, 7 S.D. 42, 63 N.W. 223, 224 (1895).  "A reasonable doubt upon the

question must be solved in favor of the legislative act, and the act sustained." *Id.*[49]

We have continued to follow that standard. *See, e.g., Tracfone Wireless, Inc. v. S.D. Dep't of Revenue & Regulation*, 2010 S.D. 6, ¶ 22, 778 N.W.2d 130, 137; *Metro. Life Ins. Co. v. Kinsman*, 2008 S.D. 24, ¶ 18, 747 N.W.2d 653, 661. Today the Court once again properly applies that standard of review. Thus, the words of this Court written shortly after statehood are appropriate:

> The object to be sought is the thought of the constitution makers in the use of this expression . . . . In case of doubt between different constructions claimed for a constitutional or statutory provision, or the meaning of a term, it is always allowable to inquire what results would legitimately follow either, with a view of ascertaining, if possible, whether such consequences were contemplated or intended.

*State ex rel. McGee v. Gardner*, 3 S.D. 553, 54 N.W. 606, 607 (1893). *See also Cummings*, 495 N.W.2d at 499.

[¶94.] In conclusion, the foregoing establishes: (1) that there was no revolution or even a significant change in education standards by the enactment of Art. VIII in 1889; (2) since 1889 there is no legal or historical basis which supports a claim that prior to the filing of this action the State was out of compliance with Art. VIII; and (3) there is no legal or historical basis to analyze the facts of this case

---

49. Two members of the *In re State Bonds* Court had also been delegates to a Constitutional Convention, and, in the case of Judge Kellam, all three conventions. *Green*, 1996 S.D. 146, ¶ 19 n.10, 557 N.W.2d at 402 n.10; *McDonald*, 90 S.D. 599, 246 N.W.2d at 97. The views of these constitutional draftsmen have been found to be "particularly enlightening" in their constitutional scholarship after they joined the South Dakota Supreme Court. *Green*, 1996 S.D. 146, ¶ 19 n.10, 557 N.W.2d at 402 n.10. In *McDonald*, the Court held that "the likelihood of misapprehension" by Kellam's constitutional analysis "is too remote to be seriously entertained." 246 N.W.2d at 97.

under a different standard than was done by the trial court. Thus, Article VIII sets a constitutional floor for support of education from which the Legislature, not this Court, can ascend.

**THE FACTUAL ISSUE**[50]

[¶95.] Plaintiffs offered evidence from six school districts called "focus districts," which include the Faith, Doland, Florence, Bon Homme, Willow Lake and Rapid City districts, as proof of state-wide deficiencies in funding compliance with Article VIII.

[¶96.] Dr. Rick Melmer was formerly the South Dakota Secretary of Education. While in that position, he testified to visiting over 100 of the 161 school districts in South Dakota. He concluded that the conditions claimed by Plaintiffs to exist in the six focus districts are not representative of the situation around South Dakota.[51] Even if this foundational hurdle is cleared by Plaintiffs, they still have to contend with the trial court's extensive findings of fact. The trial court entered 433 detailed findings of fact concerning the six focus districts which cover 83 pages. In large part, the trial court concluded the generally negative testimony by superintendents and others from the focus districts was not as probative as other more positive testimony and evidence presented. Its findings are more in

---

50. We base our decision on the factual record presented to the trial court and not on any subsequent enactments by the Legislature.

51. Perhaps for that reason, the trial court also entered extensive findings of fact on the following school districts: Sanborn Central, Miller, Avon, Faulkton Area, Hamlin, Sisseton, White River, McLaughlin, Shannon County, and Flandreau. The trial court found that each of these school districts was providing a constitutionally adequate education.

conformity with Britton-Hecla's Superintendent Don Kirkegaard, also a member of the State Board of Education, who testified that, in his opinion, not a single district in the state lacked sufficient resources to prepare its students to find meaningful employment, compete effectively in the economy, have the opportunity for higher education, and function as capable voters and jurors. Suffice it to say that the trial court's appraisal of those districts was substantially more positive than that of Plaintiffs' witnesses. This led to a finding by the trial court that each of the focus districts was providing a constitutionally adequate education.

[¶97.] The Court today enters into a comparison of the factual evidence submitted to the trial court by the Plaintiffs and the State. The trial court in large part found the factual presentation of the State to be the most probative and entered findings of fact accordingly. Although this Court finds no "clear error" in the trial court's findings on this subject, the correct analysis should be whether those findings are clearly erroneous. *Action Carrier, Inc. v. United Nat'l Ins. Co.*, 2005 S.D. 57, ¶ 11, 697 N.W.2d 387, 391 ("The trial court's findings of fact are presumed correct and we defer to those findings unless the evidence clearly preponderates against them.").

### 1) Faith School District

[¶98.] The Faith School District is located in northwest South Dakota serving students primarily in Meade County. There were 194 students enrolled in the Faith School District during the 2008-2009 school year and the superintendent anticipated enrollment would continue to be stable or decline slightly. The total per-student expenditure for the school year ending in 2007 was $7,688. In 2008,

Faith received money under the state-funded sparsity adjustment for the third straight fiscal year. The amount was $90,000 to $100,000. The trial court found classes in Faith were held in a combination of modular classrooms and a gymnasium in its former school building.

[¶99.] Plaintiffs rely on testimony from the superintendent of the Faith School District who testified to a lack of sufficient general funds leading to cuts in staff, programs, and services. The superintendent testified to using opt-outs and indicated consolidation was not an option. He further expressed reservations over the effectiveness of televised instruction and concerns over limited course offerings. Finally, the superintendent expressed concern of the expansion of the duties of administrative staff beyond their capabilities.

[¶100.] With regard to the superintendent's testimony over funding cuts, the necessity of opt-outs, and the impracticability of consolidation, the trial court found opt-outs were part of the funding system and that Dupree was 23 miles away and already shared programs with Faith, making consolidation an option. It also found the school had "state of the art technology," offered a number of classes through interactive television, and that the superintendent himself stressed the student body's "21st century skills" in a grant application. Although the superintendent showed concern that students had failed language courses taken through televised instruction, he conceded students could fail a live class as well and did not testify to overall failure rates.

[¶101.] The trial court found that despite the superintendent's concerns over limited course offerings, Faith offered all courses necessary for students to qualify

for Opportunity and Regent Scholarships and that Faith actually had two Regent Scholars in 2008. It also offered advanced placement courses through the internet. With regard to technical course offerings, the trial court found the school district offered a number of rotating courses through an area services agency in subjects as diverse as Building Trades and Health Occupations.

[¶102.] As to the superintendent's contentions concerning expansion of the duties of administrative staff, the trial court found Faith had 197 students in its entire K-12 program. This works out to an average class size of 15 students. To administer this system, the superintendent was assisted by an elementary principal and a guidance director and also received management support services from an educational services agency. The trial court found that the school district accepted a large number of students through open enrollment, indicating that the school and its staff were not so overburdened that they could not handle the number of students.

[¶103.] Despite the concerns over funding issues raised by its superintendent, the trial court found that, among other things, the Faith School District provided a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.

### 2) Doland School District

[¶104.] The Doland School District is located in northeast South Dakota, primarily in Spink County. The school district had 145 students enrolled in the 2008-2009 school year. Its total per student expenditure for the school year ending in 2007 was $9,022. For the 2006-2007 school year, the trial court found Doland

had total general fund expenditures of $1,273,364. That same year, Doland maintained a general fund reserve balance of $644,523, approximately 50% of its annual general fund.

[¶105.]     Plaintiffs rely on testimony from the superintendent of the Doland School District regarding struggles to meet financial obligations, the necessity of opt-outs, and the impracticability of consolidation. In terms of educational opportunity, the superintendent testified to understaffing and the necessity of combining elementary classes. Other areas of concern for the superintendent were out-of-date textbooks, cuts in agricultural and technical courses, and understaffing in its two Hutterite colony schools.

[¶106.]     Although the Doland superintendent expressed concerns over financial struggles, he also testified Doland was not currently facing financial difficulties. Doland had opted out of the limitation on the general fund levy and the trial court found this gave it the ability to levy for an additional $227,000 every year in addition to state aid formula money. Accordingly, the court found Doland was able to serve its student population in a constitutionally sufficient manner. The court also found the distances between surrounding districts did not pose a barrier to consolidation with three districts within 20 miles of Doland.

[¶107.]     Regarding understaffing and combining elementary classes, the trial court found Doland had some classes as small as "five or so" students per grade. Thus, the court found "nothing improper" about combining classes. The superintendent's contentions concerning out-of-date textbooks were addressed by

the general fund reserve balance and the fact the district could levy for additional capital outlay funds for books.

[¶108.] The trial court attributed the lack of agriculture classes to evidence of declining student involvement in those courses over several years. As for technical courses, the court found the district offered Family and Consumer Science, Personal Finance, Computer Training, and Occupation Prep.

[¶109.] Based upon its consideration of the foregoing funding issues, the trial court found Doland was not suffering from financial difficulties and that predictions of future deficiencies were too premature for consideration. It concluded that Doland was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.

### 3) Florence School District

[¶110.] The Florence School District is located in northeast South Dakota, primarily in Codington County. The trial court found the Florence School District had 241 students enrolled for the 2007-2008 school year. For the school year ending in 2007, its total per-student expenditure was $7,229.

[¶111.] Plaintiffs reference testimony from the Florence superintendent concerning funding difficulties, deficit spending, and lack of sufficient course offerings, extracurricular activities and administrative personnel. The superintendent testified he did not believe Florence was providing an adequate educational opportunity and Plaintiffs buttress that testimony on appeal with references to testimony to the same effect from two state board of education members and a state legislator.

[¶112.]      As for funding difficulties, the trial court found Florence had a general fund balance of over $300,000 at the time of trial and had not opted out in its tax levies. Thus, an opt-out remained available to it. The court also held consolidation was an option for Florence with two other school districts lying within approximately 20 miles. In that regard, the court noted Florence was already cooperating with nearby school districts in certain course offerings and sporting activities.

[¶113.]      With reference to course offerings, the trial court found Florence provided all math and science classes required to meet distinguished track curriculum requirements. Although concerns were expressed with televised class offerings, the acceptability of televised instruction did not equate with deficient instruction. Specific concerns with televised physics classes were addressed by employment of an on-site teacher who rotated with another school. As for technical courses, Florence offered agriculture classes at its own school and also provided access to ten different classes at a multi-district facility in nearby Watertown. The Florence superintendent admitted the multi-district classes provided an excellent opportunity for juniors and seniors. Deficiencies in fine arts offerings appeared to be more attributable to televised scheduling issues than lack of resources.

[¶114.]      The trial court found there were 241 students with less than 20 students per class in the elementary school and high school classes of 12 to 25 students per grade. The superintendent was assisted in his administration of this system by two lead elementary teachers carrying out elementary principal duties.

[¶115.]     Plaintiffs also reference the testimony of two state board of education members and a legislator who buttressed the superintendent's criticisms of the Florence School District during pretrial depositions. However, during trial they equivocated in their evaluations after being presented with additional information concerning the conditions and course offerings at the school.

[¶116.]     The trial court found that, despite the above funding issues, the Florence School District continued to maintain a "healthy" fund balance and provided a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.

### 4)     Bon Homme School District

[¶117.]     The Bon Homme School District is located in southeast South Dakota in Bon Homme County. The trial court found there were approximately 550 students enrolled in the Bon Homme School District for the 2008-2009 school year. The per-student expenditure for the school year ending in 2007 was $7,483.

[¶118.]     Plaintiffs challenge conditions in the Bon Homme School District, pointing to the superintendent's concerns over funding difficulties and rejected opt-outs. He also testified that consolidation was not an option. The superintendent indicated Bon Homme had instituted a four-day school week and was experiencing classroom overcrowding with teachers handling as many as 145 students in core classes. As a result, he expressed concerns that teachers were "burning out" and might leave. Plaintiffs sought to buttress the superintendent's testimony with testimony from a state legislator that the district did not have sufficient funds to meet its expenditures.

[¶119.] As for funding difficulties, the trial court found the Bon Homme district received impact aid funds for its needs and made appropriate use of those funds. It further found the district was operating four elementary schools within a 15-mile radius of Tyndall and that three of those schools had very few students. One was a school in a Hutterite colony with only three to ten students in each grade. The other two small schools averaged only seven to eleven students per grade. Thus, as testified to by Dr. Melmer, the trial court found the school district was maintaining too many facilities for the size of its enrollment. It further found that some intra-district consolidation would save transportation, maintenance, and fuel costs, particularly if one or more of the elementary schools were closed. In addition, the court found two other school districts within a 20-mile radius of Tyndall provided additional consolidation options.

[¶120.] With regard to the four-day school week, the superintendent testified funding was not the main reason for the change, though it did save some money. Classroom overcrowding occurred in a single geometry class and involved an excess of five or fewer students. The issue did not occur again in a subsequent school year and overall student enrollment was declining. The trial court found no reason to expect overcrowding would occur again and that the issue was moot. The figure of 145 students in core classes was a reference to the total number of students per teacher in some core areas, not the number of students in one class. The overall ratio of students to staff was approximately 13-to-1 in 2007. Despite concerns over teachers leaving, the trial court found the average number of years of teaching

experience in the district was 14.2 with over 30% of the teachers holding advanced degrees.

[¶121.] A legislator's testimony claimed as supporting the superintendent's concerns was equivocal as to overall conditions in the Bon Homme School District. While the legislator shared some of the superintendent's concerns, the trial court found that he also testified the school district was providing an excellent education. Although the legislator testified the school district was under-funded, he further testified it was under-funded in the sense of overspending its resources, not that it did not have sufficient resources. In that regard, the legislator agreed it was not advisable for the school district to operate four attendance centers.

[¶122.] Based upon its review of the financial circumstances in the Bon Homme School District, the trial court found the district's claims of dire conditions and that it would soon be "broke" were premature and that it was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.

### 5) Willow Lake School District

[¶123.] The Willow Lake School District is located in northeast South Dakota in Clark County. The trial court found the student body in Willow Lake was small and steadily decreasing. At the time of trial, there were 195 students, which was down from 212 students five years earlier. The school district's total per-student expenditure for the school year ending in 2007 was $9,066.

[¶124.] Plaintiffs rely on testimony from the superintendent for the Willow Lake School District. The superintendent testified that the district was not

provided with sufficient funding resources and that consolidation was not an option. He testified about concerns over his workload and a lack of vacation time, budget cuts and salary freezes, the necessity of opt-outs, deficiencies in course offerings, and outdated textbooks.

[¶125.]     The trial court found the school district was $124,000 short in its general fund.  However, it also found that, while the district had opted out so that it could levy up to $200,000 per year in general funds, it was actually levying only $100,000 to $125,000.  The court found a complete levy would "go a long way" toward overcoming the shortage.  The court also found three schools in a 26-mile radius of Willow Lake that already offered sports on a cooperative basis with the school district and would provide it with consolidation options.

[¶126.]     The trial court addressed the superintendent's claims concerning his workload, finding that there were 195 students in the entire school district, i.e., an average of 15 students per class, that the superintendent was assisted by a "capable high school principal," and that he also received administrative assistance from an educational services agency.  The superintendent also testified he was assisted by a secretary and a business manager.  Regarding budget cuts and salary freezes, the trial court found the district lacked funds and made cuts before passing its opt-out and that it had the ability to pass an opt-out sooner and did not do so.  It further found the superintendent stated at trial that teacher salaries were competitive for a school of its size.

[¶127.]     In the area of course offerings, the trial court found that Willow Lake School District provided all classes the students needed to compete for Opportunity

and Regent Scholarships. The court found that the school district met the minimum state curriculum standards for math and also offered the requisite units to meet the distinguished criteria for the Opportunity Scholarship. The court also found the school district offered a number of technical courses in family and consumer science and several agriculture courses.

[¶128.] Finally, as to out-of-date textbooks, the trial court found textbooks could be purchased with capital outlay or general funds and that the school district had not taken advantage of its ability to raise funds to take care of this issue. Based upon testimony from Dr. Melmer, it further found Willow Lake's out-of-date textbooks were not representative of conditions around the state.

[¶129.] Despite the superintendent's funding issues regarding the Willow Lake School District, the trial court found that the district was providing a constitutionally adequate education. Plaintiffs have not shown that these findings are clearly erroneous.

### 6) Rapid City Area School District

[¶130.] The Rapid City Area School District (Rapid City) is located in southwest South Dakota in Pennington County. It is the second largest school district in the state. The trial court found that Rapid City operated 15 elementary schools, five middle schools, two traditional high schools, and two alternative high schools. Total enrollment was 13,115 for the 2007-2008 school year. The total per-student expenditure for the school year ending in 2007 was $6,554.

[¶131.] No authorized representative of Rapid City testified at trial. Instead, Plaintiffs rely on testimony from a former school board member. Plaintiffs

attempted to qualify him as an expert at trial, but the trial court declined to recognize him as such because he did not have a degree in education administration, was not a certified teacher or administrator, and admitted he was not an expert in education administration. Thus, the trial court declined to consider the former board member's testimony regarding the requirements of No Child Left Behind and the "achievement gap" in Rapid City as expert testimony. Instead, the trial court relied upon the expert testimony of defense expert Dr. John Murphy. Dr. Murphy had reviewed Rapid City, was favorably impressed, and opined that it was providing the opportunity for an adequate education.

[¶132.]    The former board member complained of insufficient resources, depleted budget reserves, numerous staff cuts, and the removal of vocational offerings to a local technical college. The board member made specific complaints about cuts in the number of guidance counselors, overcrowding, and the loss of a virtual high school program.

[¶133.]    Rapid City had an excess general fund balance each year from 2001 to 2008 ranging from 9.5% to 15%. At the end of fiscal year 2008, the general fund balance was equal to 10.5% of the total Rapid City general fund budget. The former board member testified that if budgeted sums were fully expended as contemplated by the 2008-2009 preliminary budget, Rapid City would have a general fund excess fund balance at the end of the 2008-2009 school year in the amount of $4,000,000, or 5% of the total budget.

[¶134.]    Although Rapid City had made a number of budget and staff cuts, the trial court also found that from 1998 to 2004, the school district experienced a

decline of about 1,000 students. The counseling staff was reduced, but the trial court found the state does not require a specific ratio of guidance counselors to students. Foreign language programs were eliminated from the middle schools, but no data was provided as to how elimination of the programs might affect later student performance. There was also conflicting testimony regarding the staff cuts. Although the former board member testified to a reduction in certified staff, Rapid City reports to the State indicated it had hired over 60 new employees in the previous three years and that staff had not declined. The student-to-staff ratio was 16-to-1 in the 2006-2007 school year.

[¶135.] Despite program cuts, the trial court found that Rapid City had extensive course offerings reflected in a 78-page manual listing high school classes for the 2008-2009 school year. Rapid City provided the curriculum required by the State Department of Education and provided all course requirements for Opportunity and Regent Scholarships. Contrary to the former board member's testimony, the trial court found evidence that Rapid City offered a comprehensive range of courses in technical areas, including subjects such as marketing and engineering principles. Vocational offerings at a local technical college were a dual credit opportunity in addition to those courses offered at the high schools.

[¶136.] As with the previous focus districts, the trial court found that despite its funding issues, Rapid City was providing a constitutionally adequate education. It further found that many of the former board member's predictions of financial difficulties predicated upon estimates of future spending were "premature." Plaintiffs have not shown that these findings are clearly erroneous.

**CONCLUSION**

[¶137.] When one analyzes the legal issue of the meaning of Article VIII and its history, they do not support the heightened legal interpretations advocated by Plaintiffs. Whether or not one accepts the focus districts as representative of the state's school districts, the trial court's findings of fact are not clearly erroneous and conclusions of law are not in error. As Plaintiffs fail on both the legal and factual issues, there is no necessity to go further into any causation issues.

[¶138.] Article VIII was drawn from the public policy and language of 1889. It may seem today to some to be archaic and incapable of serving the state's current educational needs and public policy goals. However, this Court is "not concerned with the wisdom or expediency or the need" for this constitutional provision, but only whether it limits the power of the Legislature and, if so, in what manner. *Poppen*, 520 N.W.2d at 242 (citing *Queenside Hills Realty Co., Inc. v. Saxl*, 328 U.S. 80, 82, 66 S. Ct. 850, 851, 90 L. Ed. 1096 (1945)). While the meaning of words such as "a general and uniform system of public schools," "adopt all suitable means to secure the people the advantages and opportunities of education" and a "thorough and efficient system of schools," may be reviewed in the context of the times as this Court did in *Dailey,* the words themselves do not change. *See Dailey*, 57 S.D. 554, 234 N.W. at 48. They set the standard in 1889 and still do today. As Justice Hugo Black once observed concerning the issue of constitutional interpretation:

> I realize that many good and able [persons] have eloquently spoken and written, sometimes in rhapsodical strains, about the duty of this Court to keep the Constitution in tune with the times. The idea is that the Constitution must be changed from time to time and that this Court is charged with a duty to make those changes. For myself, I must with all deference reject that

> philosophy. The Constitution makers knew the need for change and provided for it. Amendments suggested by the people's elected representatives can be submitted to the people or their selected agents for ratification. That method of change was good for our Fathers, and being some-what old-fashioned I must add it is good enough for me.

*Griswold v. Connecticut*, 381 U.S. 479, 522, 85 S. Ct. 1678, 1702, 14 L. Ed. 2d 510, 537 (1965) (Black, J., dissenting).

[¶139.]       The issue of education is a great and weighty one. The United States Supreme Court correctly set forth the limited function of courts in conducting a legal review of the acts of a legislative body and the facts surrounding the adoption of a constitutional or legislative standard. *See, e.g., DeCoteau v. Dist. Cnty. Ct. for the 10th Jud. Dist.*, 420 U.S. 425, 449, 95 S. Ct. 1082, 1095, 43 L. Ed. 2d 300 (1975). In light of a claim of "calamitous results" which the parties claimed could flow from the Court's decision, the Court observed that "these competing pleas are not for us to adjudge, for our task here is a narrow one. . . . Some might wish [our constitutional drafters] had spoken differently, but we cannot remake history." *Id.*

[¶140.]       The Court holds today that Plaintiffs have failed to establish beyond a reasonable doubt a constitutional violation of Article VIII. I agree. That being the case, our Constitution mandates that these kinds of disputed issues are to be brought before the people's popularly elected Legislature. That body, and not this Court, is the appropriate forum for resolution of such issues. In so concluding, however, I echo the views of the United States Supreme Court in *San Antonio*

*Independent School District*:

> Nothing this Court holds today in any way detracts from our historic dedication to public education. We are in complete agreement that 'the grave significance of education both to the individual and to our society' cannot be doubted.

411 U.S. at 30, 93 S. Ct. at 1295.

[¶141.] For the above reasons, I concur in result.